65 U.S. 41
 24 How. 41
 16 L.Ed. 604
 BRADDOCK JONES, PLAINTIFF IN ERROR,
v.
JAMES G. SOULARD.
 December Term, 1860
 
 1
 THIS case was brought up by writ of error from the Circuit Court of the United States for the district of Missouri.
 
 
 2
 It was an action of ejectment brought by Soulard, a citizen of Illinois, against Jones, a citizen of Missouri, to recover a parcel of ground lying in the city of St. Louis, in Missouri, described as the northern half of United States survey four hundred and four of the St. Louis series of school lands. In finding a verdict for the plaintiff, the jury described the property as so much of the northern half of the United States survey 404 of the St. Louis series of school lands as is contained in the St. Louis city block 873.
 
 
 3
 In the course of the trial below it was admitted that the plaintiff had in him all the title to the land that was vested in the schools under the acts and proceedings which will be presently mentioned; and that the defendant, who was in possession, had in him all the title that was vested in the city of St. Louis and Robert Duncan, under his pre-emption entry.
 
 
 4
 As to the description of the property, it was further admitted that on the 13th of June, 1812, there was a naked sand-bar in the Mississippi river, near St. Louis, which was, at that time, surrounded on all sides by fresh water, navigable, in fact, for the craft usually navigating said river, but many miles above the influence of the ebb and flow of the tide, and was covered by ordinary high water when the river was within its banks, and that it continued to be such a bar, and unfit for cultivation, until after Missouri was admitted into the Union; that the premises in dispute were part of an island called Duncan's island, which was formed from said sand-bar, after Missouri was admitted into the Union; and that they lie, and always did lie, west of the main channel of the Mississippi river, and within township 45 north, range 7 east of the 5th principal meridian, and are also within the assignment to the schools, and the out-boundary directed to be run by the 1st section of the act of 13th June, 1812, provided that that boundary is to be construed as extending to the middle of the main channel of the Mississippi river; that said premises are also within Duncan's pre-emption entry aforesaid; and that the island is now connected with the Missouri shore by the filling up of the intervening channel, brought about by dikes constructed by the city of St. Louis since the year 1840.
 
 
 5
 It was proved that the premises in the possession of said defendant were worth three thousand dollars.
 
 
 6
 As the plaintiff below claimed under the schools, and the principal question in the case was, whether or not the land assigned to the schools extended into the river so as to make the middle of the channel the eastern boundary thereof, it is necessary to state the title more particularly.
 
 
 7
 In 1809, the town of St. Louis was incorporated by an order of the Court of Common Pleas for the district of Louisiana. Its eastern boundary was the river Mississippi.
 
 
 8
 On the 13th of June, 1812, Congress passed an act confirming the titles of the inhabitants of out lots, village lots, &c., which were to be surveyed; and enacting, further, 'that all town or village lots, out lots, or common field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be and the same are hereby reserved for the support of schools in the respective towns or villages aforesaid.'
 
 
 9
 As the property in question was not rightfully owned or claimed by any private individual, or held as commons, or reserved by the President, of course it fell within the reserving clause, provided the legal boundaries included it.
 
 
 10
 On the 26th May, 1824, an act was passed directing the surveyor general to survey, designate, and set apart, the vacant lots for the support of schools mentioned in the act of 1812. This survey was not executed until 1856, and the report of the surveyor general stated that the property in question was within the limits of the town of St. Louis, as it stood incorporated on the 13th of June, 1812.
 
 
 11
 In 1831, Congress passed an act on the 27th of January, relinquishing all their right, title, and interest, in and to the town and village lots, out lots, and common field lots, in the State of Missouri, reserved for the support of schools, to be sold and disposed of, or regulated for the above purposes, in such manner as may be directed by the Legislature of said State.
 
 
 12
 In execution of the above power, the Legislature of Missouri passed an act on the 13th of February, 1833, creating a school corporation. By it all free persons residing in St. Louis were erected into a corporation, who were directed to take possession of all the lots which had been reserved for school purposes, the title to which was vested in the corporation.
 
 
 13
 It has been before stated that it was admitted, on the trial below, that all this title was vested in Soulard, the plaintiff in the ejectment.
 
 
 14
 The defendant claimed title under the following heads:
 
 
 15
 1. An entry made by Robert Duncan, in 1835, including the premises in controversy, but which had been cancelled by the Commissioner of the General Land Office, as having been made in violation of law.
 
 
 16
 2. Under an act of the Legislature of Missouri, passed in 1851, transferring the title of the State to two islands in the Mississippi river, in the county of St. Louis—one called and known as Duncan's island, (on which are the premises in controversy,) situated, &c.—to the city of St. Louis. The defendant below had, in himself, the whole of this title.
 
 
 17
 After the evidence was concluded upon both sides, the Circuit Court gave to the jury the following instructions, viz:
 
 
 18
 'The jury is instructed that if the land in controversy be within the Congressional township 45 north, of range 7 east, west of the middle of the main channel of the Mississippi river, and bounded on the west by the United States survey number 1,333, then it is within the out-boundary directed, by the 1st section of the act of 13th June, 1812, to be run for St. Louis; and the assignment of the schools read in evidence, the deed of the schools to H. G., B. A., and J. G. Soulard, and the lease of the said H. G. and B. A. Soulard, taken in connection with the acts of Congress of June 13, 1812, the act of 26th May, 1824, and the act of 27th January, 1831, and the act of the 13th February, 1833, of the Legislature of Missouri, vest in the plaintiff the legal title to the northern half of the survey 404; and, if the defendants were in possession of said premises at the commencement of this suit, the jury must find for the plaintiff.'
 
 
 19
 To the giving of which the defendant objected; but the court overruled the objection, and gave the instruction, to which opinion the defendant then and there excepted. And thereupon the defendant moved the court for the following instructions, viz:
 
 
 20
 'If, as early as the 13th of June, 1812, the land sued for was at low water only a naked bar in the Mississippi river, near St. Louis, surrounded on all sides by navigable water, and covered at ordinary high water, when the river was within its banks, and continued to be such a bar, unfit for cultivation, at the time Missouri became a sovereign State, then the plaintiff cannot recover upon the title he has shown in evidence.'
 
 
 21
 Which the court refused to give, and to which opinion of the court the defendant then and there excepted.
 
 
 22
 Upon these two exceptions the case came up to this court.
 
 
 23
 It was argued by Mr. Garesch e for the plaintiff in error, with whom was Mr. Montgomery Blair, and by Mr. Garett for the defendant in error, upon printed arguments.
 
 
 24
 The counsel for the plaintiff in error laid down the following propositions, viz:
 
 
 25
 1. That the town of St. Louis, as the same stood incorporated on the 13th June, 1812, did not extend to the middle of the main channel of the Mississippi river, as its eastern boundary, but only to high-water mark on its right bank.
 
 
 26
 2. Even if it did so extend, yet, at most, the land in controversy was but reserved for the support of schools, not actually granted for that purpose, and upon the admission of the State of Missouri, in 1820, it became the property of the State.
 
 
 27
 3. That the first direct grant of this land by the State was made by the act of 3d March, 1851, under which plaintiff in error claims.
 
 
 28
 The general proposition first laid down depends on the correctness of the following argument, viz: The limit of private ownership on water-courses, when these are navigable in law, or arms of the sea, is high-water mark; and such rivers as the Ohio and Mississippi are of the same nature and dignity at law, above tide-water, as ordinary rivers below the flow of the tide.
 
 
 29
 It will not be denied, that when land is bounded by a tide-water river, the limit of private property is the mark to which high tide ascends. This is the point to which the sea flows, and, whether on the seashore or in the arms of the sea, it divides the King's or the State's domain from that of the individual.
 
 
 30
 The second branch of this first general proposition is more debatable. The plaintiff in error will argue it as follows: Arms of the sea or rivers, as far as the tide ebbs and flows, are navigable waters in England; and no waters are navigable in that country except tide-waters. Above the ebb and flow of the tide, no river of England is navigable at all. In inquiring into the definition of navigable streams in that country, therefore, it was found that they were correctly described to be those in which the tide ebbed and flowed. But navigability is the principal thing; the flowing of the tide is a mere incident. When, therefore, we find that there are navigable waters in America, or elsewhere, not flowed by the tide, we seek other definitions of navigable water, the flowing of the tide being no longer a test. Whatever be the new definition, we attach to navigable waters here the same consequences, properties, and incidents, that the jurists of England attached to navigable waters in that country. In other words, we treat our Western inland rivers in the same manner, and claim for them and the land bordering on them the same legal consequences, that are predicable of arms of the sea, properly so called, in England.
 
 
 31
 Upon the soundness of these positions the argument for plaintiff in error wholly depends.
 
 
 32
 That no rivers in England are navigable above tide-water is well settled. It is so declared in 12 How., 454, Genesee Chief v. Fitzhugh et al. The words of the court are: 'In England, undoubtedly, the writers upon the subject, and the decisions in its courts of admiralty, always speak of the jurisdiction as confined to tide-water; and this definition, in England, was a sound and reasonable one, because there was no navigable stream in the country beyond the ebb and flow of the tide. * * * In England, therefore, tide-water and navigable water are synonymous terms.'
 
 
 33
 It is unnecessary to go beyond this. It will be taken for granted in all the residue of this argument, that this proposition is established beyond challenge.
 
 
 34
 In the same decision it was declared in the most solemn and emphatic manner that such a definition was inapplicable to the rivers and lakes of America, and that these were public navigable waters. (P. 454.)
 
 
 35
 This being settled, it is difficult to resist the conclusion that they have all the properties of public navigable waters, such as the sea, and its arms which are flowed by the tide; which last is declared to be an immaterial circumstance, and by no means an essential feature of navigability. (Id. ibid.)
 
 
 36
 If this be conceded, the case of the defendant in error is at an end, for one of the properties of arms of the sea is not to be the subject of private ownership below high-water mark. Arms of the sea od not belong to the owners of the adjacent soil; and when a man owns land bounded on a river flowed by the tide, his land is limited by the mark of high water, and does not go to the medium filum aquae.
 
 
 37
 This view of the subject is supported by the following most respectable authorities, viz:
 
 
 38
 Pennsylvania—7 Barr., Naylor v. Ingersoll; 1 Penn. Rep., 105; 2 Binney, 475, Carson v. Blazer; 14 Serg. and Rawle, 71-74; 8 Watts, 434; 9 Watts, 228.
 
 
 39
 North Carolina—2 Devereux, 30-36.
 
 
 40
 Tennessee—6 Humphrey, 358, Elder v. Burrows.
 
 
 41
 Iowa—3 Iowa Rep., 1, McManus v. Carmichael; 4 Iowa Rep., 199, Haight v. City of Keokuk.
 
 
 42
 Michigan—1 Walker Ch., 155.
 
 
 43
 Alabama—2 Porter, 436, Bullock v. Wilson.
 
 
 44
 But the plaintiff in error is free to confess that in some of the other States of the Union perhaps in a majority of them, a contrary doctrine has been laid down, and that the decisions of the State of Missouri, and of the Supreme Court of the United States, may be cited in opposition to the views which it is the duty of the plaintiff in error to enforce.
 
 
 45
 It is imagined that peculiar stress will be laid upon those cases to be found in the Missouri Reports which conflict with the doctrine contended for by the plaintiff in error. But it is believed that but little weight is due to these Missouri decisions, for in all of them the matter seems to have passed without serious dispute or discussion. There is no evidence that the matter was argued at the hearing, and it is almost certain that the points now made were not presented to the court on those occasions. If they were, they received no attention. Under these circumstances, it is submitted that this court should consider itself free to consider the case as of the first impression, so far as the decisions of the Supreme Court of Missouri are concerned.
 
 
 46
 As to the decision of this court in the case of Howard v. Ingersoll, 13 How., 416-422, the point covered by this dictum was not necessarily decided, and so what fell from the court on that occasion was obiter dictum.
 
 
 47
 If the decisions of the Supreme Court of Missouri be not regarded as binding, and those of this court be not considered applicable to the matter in hand, there can be no occasion to notice those cases which may be quoted from other States, no matter what degree of appositeness may be claimed for them.
 
 
 48
 [The argument of the counsel upon the second point, viz: that the State of Missouri, upon her admission into the Union in 1820, became entitled to this navigable water, under the decision of this court in the case of Pollard's Lessee v. Hagan, in 3 Howard, 212, is omitted.]
 
 
 49
 Mr. Garett, the counsel for the defendant in error, submitted the following propositions, viz:
 
 
 50
 1. The documents read in evidence by the plaintiff below are conclusive in favor of the plaintiff against any one not having a better title under the United States to the premises in controversy.
 
 
 51
 2. The land within the assignment and survey 404 is, as a proposition of fact, admitted to be in T. 45, R. 7 E., in St. Louis county, and to be within the reservation for the schools by the second section of the act of 13th June, 1812; provided, that the eastern boundary of the town of St. Louis, as then incorporated, was the middle of the main channel of the Mississippi river. But is the middle of this channel that eastern boundary, as a proposition of law?
 
 
 52
 3. If it was within this reservation, the title passed to the school corporation by the several acts and documents read in evidence by plaintiff, whether, upon the admission of Missouri as a State, the proprietary right to the premises in controversy was continued in the United States, or transferred to the State of Missouri.
 
 
 53
 Upon the first proposition, it is not intended to do more than refer to the case of Kissell v. the Schools, 18 Howard's Rep., 19, where this matter was carefully considered, and where the very pre-emption of Duncan, which is set up as one of the defences in this action, was pronounced to be a nullity.
 
 
 54
 The examination of the second proposition brings up the inquiry, whether the eastern boundary of the town of St. Louis, as it stood incorporated at the date of the act of 13th June, 1812, was the middle of the main channel of the Mississippi river; and whether the out-boundary, run by the surveyor general in 1840, had for its eastern boundary the middle of the main channel of the Mississippi river.
 
 
 55
 The words used in each case are substantially the same. But inasmuch as the out-boundary directed to be run by the first section of the act quoted was to be the 'out-boundary line of the town,' and was to be run so as 'to include the out-lots, common field lots, and commons,' it follows that this out-boundary line must contain at least all the land embraced within the town, or the out-lots, or common field lots, or commons of the town, besides such other pieces or tracts of land as might be included within this continuous out-boundary, though not belonging strictly to any of these denominations.
 
 
 56
 Coming, then, to the description of the town, as it stood incorporation in 1812, we find that the calls are: 'thence due east to the Mississippi; from thence by the Mississippi to the place first mentioned.'
 
 
 57
 This is the description of an incorporated town which is bounded on the east by the Mississippi river. That this description is, in every legal sense, equivalent to a call for the middle of the main channel of the stream, is one of those propositions which, to use the language of Judge Cowen, in his learned note to Ex parte Jennings, 6 Cowen's Rep., 518-543, 'no lawyer will hazard his reputation by controverting.' In the same note, he remarks that 'the only question which can generally arise between the citizens and the State as to the ownership of rivers above the tide is, whether the former be the owner of the soil adjacent, within the meaning of Hale.' (P. 543.)
 
 
 58
 In the case at bar there can be no question of this kind, for (see 18 How., 19) the schools are the owners of all the unappropriated land, within a survey of which—whether we adopt the description of the town of St. Louis, as it stood incorporated in June, 1812, or of the out-boundary of the town, 'run so as to include he out-lots, common lots, and commons'—we find the Mississippi river designated as the eastern boundary. The only inquiry is, does this boundary carry us to the middle of the stream? In Judge Cowen's opinion, it requires a hardy man to dispute this, and certainly the weight of authority on this subject is overwhelming.
 
 
 59
 At the trial in the Circuit Court the following points were made and argued for the defendant in that court, now plaintiff in error, viz:
 
 
 60
 1. That the town of St. Louis, as the same stood incorporated on the 13th June, 1812, did not extend to the middle of the main channel of the Mississippi river as its eastern boundary, but only to high-water mark on the right bank of that stream.
 
 
 61
 2. Even if it did so extend, yet, at most, the land in controversy was only reserved for the support of schools, not actually granted for that purpose; and, upon the admission of the State of Missouri into the Union in 1820, it became the property of the State .
 
 
 62
 3. That the first direct grant of this land by the State was made by the act of March 3d, 1851, under which plaintiff in error claims.
 
 
 63
 These propositions asserted that, in the United States, a public river, navigable, in fact, though above the tide, was, ipso facto, subject to all the legal incidents of what are properly called 'arms of the sea,' or creeks and rivers flowed by the tide. This was the main position of the plaintiff in error (defendant in the court below) in the Circuit Court, and it is presumed that the same argument will be repeated here.
 
 
 64
 The defendant in error maintains that the doctrine of Sir Matthew Hale on this subject has been adopted, in all its integrity, by the judicial mind of America. He will first examine those decisions on the subject which have been made by the courts of the several States, and will then consider whether any modification of the rule thus established has been made necessary by opinions which have fallen from this court.
 
 
 65
 As the land in question lies in Missouri, we naturally look, in the first instance, to the decisions of that State to ascertain the rule by which controversies respecting land titles are to be determined.
 
 
 66
 The first decision bearing on this point occurs in 4 Mo. R., 343, O'Fallon v. Price. It was followed by the case of Shelton v. Maupin, 16 Mo., 124. Then came the case of Smith et al. v. the City of St. Louis, 21 Mo. Rep., 36; and the case of Smith et al. v. Kelly et al., not yet reported, decided at the March Term, 1860.
 
 
 67
 In all these cases, the common-law rule laid down by Hale, and referred to by Cowen, was quietly adopted by the court, and, indeed, does not seem to have been gravely questioned by the bar. The only question supposed to present any difficulty was the point which Judge Cowen states as giving rise to all the doubt on this subject which a lawyer can entertain, viz: whether the person claiming to the centre of the stream was, in truth, a riparian owner. The consequences following from the ownership of the shore were treated as being so plain as to require neither illustration nor argument.
 
 
 68
 When this question has come up, incidentally or directly, before this court, it has been treated as a settled matter. See 13 Howard's Reports, in the case of Howard v. Ingersoll, 416, (Judge Wayne's opinion,) and 422, (Judge Nelson's opinion;) see, also, 18 How., 150, Jones et al. v. Johnston. These are the latest opinions in which a reference to this principle is to be found. It had been repeatedly spoken of in like manner in earlier cases.
 
 
 69
 After referring to the decisions of the courts of Missouri and of the United States, it would seem unnecessary, in respect of the title to land in Missouri, to speak of the decisions of other States. Nevertheless, a brief citation of cases decided in the different States, all agreeing with the doctrine of Sir Matthew Hale, may not be inappropriate. All the cases which are now quoted come fully up to the ground taken by the defendant in error, viz:
 
 
 70
 Maine—Brown v. Chadbourne, 31 Maine Rep., 9.
 
 
 71
 Massachusetts—Storer v. Freeman, 6 Mass., 439; King v. King, 7 Mass., 496; Lunt v. Holland, 14 Mass., 149; Hatch v. Dwight, 17 Mass., 289.
 
 
 72
 New Hampshire—2 New Hampshire Rep., 369, Claremont v. Carleton; 11 New Hampshire Rep., 531, Greenleaf v. Kilton.
 
 
 73
 Connecticut—2 Conn. Rep., 483, Adams v. Pease; 6 Conn. Rep., 471, Warner v. Southworth.
 
 
 74
 New York—3 Caine's Rep., 307, Palmer v. Mulligan; 17 Johns. Rep., 195, People v. Platt; 20 Johns. Rep., 90, Hooker v. Cummings; 6 Cowen, 518, Ex parte Jennings; more than a dozen cases were decided afterwards in New York in which this principle is recognised, but all refer to this case and to Judge Cowen's valuable note. See 5 Paige, 137; 5 Paige, 547; 5 Wend., 447; 13 Wend., 358; 17 Wend., 571; 20 Wend., 111; 22 Wend., 425; 26 Wend., 404, &c., &c.
 
 
 75
 New Jersey—1 Halsted's Rep., 1, Arnold v. Munday; 3 Zabriskie, 624.
 
 
 76
 Maryland—5 Harr. and J., 195, Brown v. Kennedy.
 
 
 77
 Virginia—1 Rand. Rep., 417, Hays's Ex. v. Bowman.
 
 
 78
 North Carolina—Taylor's Rep., 84, (top paging,) 136, (side paging,) Hammond v. McGlaughlin.
 
 
 79
 Alabama—8 Porter, 9, Hagan et al. v. Campbell & Cleveland.
 
 
 80
 Georgia—6 Georgia Rep., 141, Young et al. v. Harrison et al.; 18 Georgia Rep., 539, Jones v. Water Lot Co., Columbus.
 
 
 81
 Mississippi—3 Smedes and Marshall, 366, Morgan et al. v. Reading.
 
 
 82
 Louisiana—6 Martin, 216, Morgan v. Livingston; 18 Louis. R., 122, Municipality No. 2 v. Cotton Press Co., Id. 278.
 
 
 83
 Tennessee—3 Swan, 9, Stuart v. Clark's Lessee, (overruling Elder v. Burrows, 6 Humphrey, 358.)
 
 
 84
 Illinois—3 Scammon, 510, Middleton v. Pritchard.
 
 
 85
 Michigan—8 Michigan Rep., (unpublished,) Lorman v. Benson.
 
 
 86
 Wisconsin—2 Wisconsin Rep., 308, Jones v. Pettibone.
 
 
 87
 Ohio—3 Ohio Rep., 495, Young v. McEntyre; 11 Ohio Rep., 138; 16 Ohio Rep., 540.
 
 
 88
 At the trial in the Circuit Court, the defendant (now plaintiff in error) cited, among other authorities to support his views, cases from the Supreme Courts of Tennessee, Alabama, and Michigan, being 6 Humphreys, 358; 2 Porter, 436; and 1 Walker Ch. Rep., 155, respectively.
 
 
 89
 The case in 6 Humphreys is overruled by that in 3 Swan, 9; and though the cases cited from Alabama and Michigan cannot be so distinctly said to have been overruled by the later cases of 8 Porter, 9, and Lorman v. Benson, (which will be found in 8 Michigan Rep. when published,) it is only because the previous decisions of those States were not as supposed by plaintiff in error; no previous decision needed to be overruled in those States. The cases cited from those States by defendant in error are unambiguous, and directly in his favor. He has been careful not to cite from any State any case which was not in point. All those which he has collated are precise, and establish, without any variation, that the bed of a fresh-water stream, or of a river above tide-water, belongs to the owner of the adjacent soil, and that this holds good whether the portion of the bed which is in question be navigable in fact or not; the only consequence of the stream admitting of navigation above tide-water being, that the proprietary right of the owner of the adjacent soil is subject to the public easement, or servitude, as it is called by Sir Matthew Hale. It is merely repeating the same idea, in almost the same words, to say that, when a piece of land is bounded by a river above tide-water, the middle of the main channel—filum aquae—is the precise line of the boundary; and, therefore, the town of St. Louis, as it stood incorporated on the 13th of June, 1812, was bounded on the east by the middle of the main channel of the Mississippi river. It is admitted that if this were so, then the premises in controversy were within the town, and within the reservation of the second section of the act of Congress of that date .
 
 
 90
 It is scarcely important to fortify a position so abundantly strong; but it may not be inappropriate to refer to the fact that the first charter of St. Louis, passed by the State Legislature directly, without the intervention of a court, expressly calls for the middle of the main channel of the river as the eastern boundary of the corporate limits of the city, and this expression is to be found in all subsequent amendments to the charter. The words of the first section of the act of December 9, 1822, (which is the first charter granted directly by the Legislature,) are as follows: 'Sec. 1. That all that district of country contained within the following limits, to wit: Beginning at a point in the middle of the main channel of the Mississippi river, due east of the southern end of a bridge across Mill creek at the lower end of the town of St. Louis; thence due west to a point at which the western line of Seventh street, extended southwardly, will intersect the same; thence northwardly along the western line of Seventh street, and continuing that course to a point due west of the northern line of Roy's tower; thence due east to the middle of the main channel of the river Mississippi; thence with the middle of the main channel of the said river to the beginning, shall be and is hereby erected into a city, by the name of the city of St. Louis.' This may be regarded at the more explicit declaration of the character and position of the eastern boundary, which the Legislature saw fit to give, instead of using the expression which had previously been used by the Court of Common Pleas on the same subject, which, to a lawyer, however, would convey precisely the same meaning.
 
 
 91
 In the Circuit Court, it was gravely stated, as a geographical truth, that in England no river was navigable, in fact, above tide-water, so as to be capable of being a public stream above that limit. Hence, (it was argued,) the point to which the tide flowed being the limit of navigability, tide-water and navigable water became convertible terms in that country, the one meaning in every respect the same thing as the other, and having all the legal incidents of the other. But the inland navigable waters of the United States being recognised as subject to the admiralty jurisdiction of its courts, (12 How., 450, Fitzhugh v. Genesee et al.,) and it having been decided (3 How., 212, Pollard's Lessee v. Hagan) that the ownership of all lands covered by tide-water within the limits of any State, and undisposed of by the United States, becomes vested in the State upon its admission into the Union; therefore, the bed of every fresh-water stream which is deep enough at its ordinary stage to float any of the boats or vessels which are used in commerce, no matter how far above the influence of the tide, becomes the property of the State on its admission into the Union, and the owner of land adjacent to such stream is bounded by high-water mark. Such was, in substance, the argument of the defendant below.
 
 
 92
 It is submitted, that nothing but a singular confusion of the senses in which the same word is used, in two distinct propositions, together with a total ignoring of the physical truths which underlie the whole learning upon this important subject, could have led those who labor under the geographical mistake above-mentioned into the adoption of the startling conclusion for which the plaintiff in error contends.
 
 
 93
 In the first place, it is far from being true that all the rivers of England are unfit for navigation above tide-water, and are not public rivers above that point. On the contrary, the citations presently to be made from Hale's Treatise, 'De Jure Maris et Brachiorum Ejusdem,' show that the distinction between rivers navigable, in fact, above tide-water, and rivers navigable in the proper, legal sense, as being arms of the sea, was just as familiar to Hale as to the American jurist; and that it was in full view of the truth that rivers might be and were used by the public as common highways, above tide-water, that the doctrines 'which,' as Judge Cowen says in his note to 6 Cowen's Rep., 543, 'at this day, no lawyer will hazard his reputation by controverting,' were laid down in the first instance by English courts, and have since then been adopted with so much uniformity by the bench and bar of America. In the second place, it is a complete missing not only of the spirit but of the letter of the two decisions quoted from 3 How. and 12 How., respectively, to suppose that they give any countenance to the conclusions announced and contended for by plaintiff in error.
 
 
 94
 By reference to the decisions of the Supreme Court of the United States since Pollard v. Hagan, it will be seen, that while the doctrine of that case has been repeatedly reaffirmed, scrupulous care has been used to restate that doctrine as it was in the first place laid down, and to limit the decision by the circumstances under which it was made, viz: that land flowed by the sea at ordinary high tide, if not previously disposed of by the United States, became the property of the State on its admission to the Union. This careful reference to tide-water, (9 How., 471; 18 How., 71-74,) and the distinction, taken as lately as 13 How., 416, 422, between fresh-water streams and the arms of the sea, properly so called, are abundantly sufficient to show, if illustration were needed, the accuracy with which the doctrine declared in Pollard's Lessee v. Hagan was adapted to the particular facts of that case, and how little it was the purpose of this court to leave any one at liberty first to misconstrue and then misapply the decision in that cause. It will presently appear how little assistance, nay, what absolute refutation of these notions, the decision of Pollard's Lessee v. Hagan actually furnishes; but it will first be shown how inattentive the plaintiff in error has been to the physical reasons underlying this legal question; how careless he has been, in his search after loose and imperfect analogies, to discriminate as to the essential and controlling facts out of which all true analogies spring, and to note the differences of circumstances which annihilate the 'parity of reason' on which he endeavors to found himself.
 
 
 95
 The use which plaintiff in error has attempted to make of some expressions to be found in the opinion of the court in 12 How., 443, and other cases, affords a good illustration of the soundness and wisdom of the rules laid down respecting the unauthorized application of words used in one particular sense, to a purpose, or a subject, or circumstances, entirely different. The rule on this point is well settled. It is to confine a dictum to the particular circumstances of the case in which it was spoken. 'What was said by my brother Ashhurst,' (said Lord Kenyon, 5 D. and E., 7,) 'in the case of Barry v. Rush, respecting the admission of assets, must be taken to refer to the particular case then under discussion, but ought not to be extended further.'
 
 
 96
 Lord Ellenborough said, (3 East., 123,) 'general language used by the court in giving their opinions in any case much always be understood with reference to the subject-matter then before them.'
 
 
 97
 Sir James Mansfield (5 Taunt., 162) used language still stronger; and in 9 Bing., 168; 2 Barn. and Ad., 124; 3 Ball and B., 286; and in numerous other cases, the same rule of common sense and of law is inculcated. Reference to American cases on this subject would extend the quotations beyond limits, and these are omitted, not because they do not exist, but because they are needless.
 
 
 98
 What, then, were the circumstances under which the remarks, from which plaintiff in error endeavors to deduce his theory, were used by the court in the case of 12 How., above referred to? The question under examination was the extent of the admiralty jurisdiction of the United States judiciary. It had been repeatedly laid down before, (see Waring et al. v. Clark, 12 How., 441, and cases there cited,) that the English rule, which excluded the jurisdiction of their courts of admiralty in all cases arising infra fauces terroe, or within the body of a country, as opposed to the high seas, was of no application in this country. In the case of 12 How., 454, it was observed that courts of admiralty had been found necessary in all commercial countries, not only for the safety and convenience of commerce and the speedy decision of controversies, where delay would be ruin, but also to administer the laws of nations in a season of war; and that it would be subjecting the States bordering on the great lakes and drained by the great rivers of the Northwest to great hardship and inequality, if the commerce on those lakes and rivers were denied the benefits of the same courts and the same jurisdiction for its protection which were accorded by common consent to similar commerce carried on in the Atlantic States. 'It would be contrary to the first principles on which the Union was formed to confine these rights to the States bordering on the Atlantic, and to the tide-water rivers connected with it, and to deny them to the citizens who border on the lakes and the great navigable streams which flow through the Western States.'
 
 
 99
 12 How., 454.
 
 
 100
 The court then proceeds to say, that there is nothing in the objection; that there is no ebb and flow of the tide in the lakes and Western rivers; that the ebb and flow of the tide does not make the waters suitable for admiralty jurisdiction, nor does the absence of a tide render them unfit. 'If it is a public navigable river on which commerce is carried on between different States or nations, the reasons for the jurisdiction is precisely the same.'
 
 
 101
 12 How., 454.
 
 
 102
 It is clear that the decision was made upon these grounds. The court recognised, in the amount and importance of the marine commerce carried on upon these inland streams, cogent reasons for asserting admiralty jurisdiction over them. The equality of the rights and privileges of the several States, which the Constitution guarantied, required that the immense marine commerce carried on between the States of the Union upon these fresh-water streams should have the same protection, the same assurance of the prompt adjustment of any questions arising in conducting it, which were enjoyed by a similar commerce on the Atlantic coast. In respect of the obligation of the General Government to furnish appropriate tribunals for these purposes, the court held, that there was no escape on the ground that the water floating the commerce was not salt or brackish. The commerce was there, in its immense proportions and importance, demanding that protection and those facilities which the Federal Government, by its very Constitution, had undertaken to furnish; and the court held, that the obligation to comply with this demand was not to be evaded on technical grounds, but to be met with the fullest and most liberal good faith. Above all things, it became the court not to be misled by any imperfect analogies. It had already decided that the English rule, limiting the jurisdiction of admiralty courts to the 'high seas,' and forbidding its exercise even on tide-water, infra fauces terrae, was wholly inapplicable in America, where it had, indeed, been disregarded from the earliest times. In like manner, the court proceeded to declare the unreasonableness of the attempt to confine admiralty jurisdiction in this country to tide-water, and, having decided the cause on other grounds, let fall the remark, that this rule, so confining them, though unreasonable here, was reasonable enough in England, because there were 'no navigable streams' above the tide in that country. The court was seeking to illustrate its meaning forcibly, and for this purpose used language which was very strong, as well as substantially correct. So small a proportion of water navigable, in fact, is to be found above the tide in England, that no one is in danger of being misunderstood when he states the rule, without the qualifications which technical, literal accuracy requires, and says, generally, that in England rivers are navigable as far as the tide ebbs and flows, and no further, and that tide-water and navigable water are convertible terms in that country, the exceptions being too trifling to affect the general rule. But when a remark, made under such circumstances, is seized upon as if it were framed with all the nicety of a scientific definition; when we hear an argument which depends for its very existence on the fact that this supposed definition is accurately and critically exact, containing no superflous or equivocal word—an argument, in short, founded on the supposed truth, that tide-water and navigable water are absolutely the same thing, precisely, in every sense, and to every intent and purpose, in England; and when we are asked to extend to water navigable, in fact, in America, the same legal properties which have from time immemorial been accorded to what are called 'arms of the sea' in England, we certainly have a right to show that there is an essential distinction between the two things; that this distinction has always been recognised in England as well as in this country; and that the point of this distinction is precisely that upon which defendant in error won this case in the court below, and seeks its affirmance here.
 
 
 103
 Apart from all judicial decision, and all the authority of the legal sages who have illustrated this subject by their labors, there is a wide and obvious physical distinction betwee the navigability of the arms of the sea—those bays, more or less extensive, putting up from the ocean into the land, which are flowed by the tide of that great reservoir—and those channels of water which lie above that source of supply. So long as the ocean keeps its bed, and the present frame of nature exists, there will always be water up to the ocean level in those channels where the tide ebbs and flows; and upon this ocean level the quantity of water falling in rain has no influence of which our senses can take cognizance. These channels, then, which, twice in twenty-four hours, are filled by the flow of the sea, have a constant, unvarying level, and are constantly and uniformly navigable. They are navigable, in a legal sense, in the fullest and largest sense of which that term admits. Their navigability does not depend upon a season more or less rainy, but only on the continued operation of laws which human experience has shown to be unvarying and constant in their operation. They are as surely navigable as the sea is navigable. Though not as deep, their surface-level is the same, and therefore they are, without any violence of expression or distortion of idea, called 'arms of the sea.'It is altogether otherwise with all the great rivers of the earth, for all parts of their course above tide-water. They depend for all the water that is in them entirely on what comes to them from the clouds. The Ganges, the Nile, the Danube, the Amazon, the Rio de la Plata, the Rio del Norte, the Mississippi, and the St. Lawrence, above tide-water, are entirely dependent upon the supply of rain. In some places, as on the eastern slope of the South American continent, upwards of three hundred inches in depth of rain fall every year. There is accordingly on that eastern slope such a system of magnificent rivers as can nowhere else be found on the face of the globe. No rain, or scarcely any, falls on the north of Africa; and accordingly, except the Nile, whose source is beyond the rainless region—this exception, therefore, proves the rule—we find no rivers there. To come to our own country, where the annual average depth of water falling in rain is nearly forty inches, we find a system of noble streams, not rivalling, indeed, the marvels of the South American continent, but in due proportion to the more limited supply of rain which they receive. The Mississippi has a course, from the sources of its principal branch in the Black-foot Indian country to its mouth near St. Louis, of more than 3,000 miles; and for more than two-thirds of this distance it is navigable at certain seasons of the year. From the mouth of the Missouri to New Orleans the Mississippi has a distance of 1,200 miles, with an average fall of more than three inches per mile, or upwards of 300 feet for the whole distance. The inclination of the bed of the Missouri is still greater, but these numbers are sufficient for illustration. The average depth of the stream opposite to St. Louis is less than 30 feet. The supply of the water which renders this river the vehicle of such countless benefits to the whole Western and Southern country is furnished entirely by the clouds. Fortunately, within certain limits, this supply is uniform. But we cannot shut our eyes to the fact that if those severe droughts, of which we have sad experience from time to time, and which have at different epochs embraced every season of the year, and every district of the region between the sources and the mouth of the river, should become permanent as to time, and universal as to space, this great river might cease to be navigable for the smallest canoe. We are all familiar with the separate phenomena which, if they should concur, would bring about this deplorable result. A dry spring, a dry summer, a dry fall, and a dry winter, in different years, we can easily remember. Should the whole succession of the seasons fail to bring us rain, no extraordinary sagacity would be required to compute the period at which the flow of the river would cease.
 
 
 104
 In considering the question of what rivers being above tidewater are yet navigable, in fact, courts of justice have repeatedly shown an impatience of the suggestion that an insignificant rivulet, which is yet subject to have its volume so increased by freshets as to render it capable of floating a ship of the line for a few hours, deserves, for that reason, to be called a navigable stream. This impatience merely marks the revolt of the judicial sense from the proposition, that any improvement can be made upon the legal definition which, in one sense, confines the term 'navigable' to tide-water. For as all rivers above tide-water depend for their navigability upon the rain which is drained into their beds, the degree to which the effect of the rain upon the volume of the stream is directly observable really makes no difference in principle. Whether the rivulet be liable to assume a momentary likeness to a river, under the influence of heavy and unusual rains, or the river, under the uniform supply which is vouchsafed to the principal inland streams of the United States, be kept to a depth affording almost constant service to the public, in the one case as in the other the supply is from the rain, and the navigableness of the stream (temporary and transient, or practically permanent) is due to this source alone. It is this accidental navigableness occurring in fresh-water streams which the law refuses to recognise in terms, when to do so would raise them to a level of dignity equal to that of the sea and its arms, and every man's reflection must confirm the sentence of the law; the distinction in kind between the grandest examples of such rivers, as the Amazon, La Plata, Orinoco, and Mississippi, above tide-water, and the shortest arms of the sea, in respect of the certainty and invariableness of their supply of water, being as substantial as can be imagined.
 
 
 105
 The same policy which forbids the acquisition of exclusive individual rights over the shore of the sea, forbids the establishment of such rights over such places as are flowed by its tide; for in truth, as far as the tide flows in any river bed, that bed would be filled by the sea if the fresh river water were entirely to fail. Let us suppose all sources supplying fresh water throughout the world to fail, the beds of the rivers remaining as now. In this case, twice in twenty-four hours, for most of these, they would be filled with water from the ocean. This would be the true limit of the dominion of the sea. No one would be at any loss then to recognise the extent of 'the sea and its arms.' Upon these, then, there is to be no encroachment by any private individual. This limit is fixed by nature and adopted by the law. If by the supply of the necessary water the river beds above these limits become navigable, they become subject to the 'servitude of bublic interest.' But while the rights of the public, or the interests of the public, have been so far consulted in respect of rivers which are thus navigable, as to secure to the community the free use of such streams as common highways, yet subject to this easement, which is, from its nature, merely accidental and temporary, the bed of the stream, usque ad filum aquae, belongs to the owner of the adjacent land. These principles were as clearly recognised, and these distinctions as clearly taken, in England as in America. The American cases already cited do not need to be quoted again; but reference will now be made to some of the expressions in Sir Matthew Hale's Treatise, to be found at large in the volume entitled 'Hargrave's Law Tracts,' and the first four chapters of which are reproduced in the notes to 6 Cowen, 540, already cited.
 
 
 106
 [The citations from the treatise of Sir Matthew Hale, and the remainder of the argument of the counsel for the defendant in error, are necessarily omitted for want of room.]
 
 
 107
 Mr. Justice CATRON delivered the opinion of the court.
 
 
 108
 Soulard sued Jones to recover the northern part of a United States survey of land laid off for the St. Louis schools. The part sued for fronts the Mississippi, and includes a sand-bar, formerly covered with water when the channel of the river was filled to a navigable stage. The land is included in the survey approved June 15th, 1843, designating the school lands; and the controversy would be governed beyond dispute by the principles declared in the case of Kissell v. St. Louis Public Schools, (18 How.,) had this been fast land in 1812, when the grant to the schools was made. But it is insisted that the title to this accretion within the Mississippi river did not pass by the act of 1812, and remained in the United States till the State of Missouri became one of the States of the Union, in 1820, when the title vested in the State as a sovereign right to land lying below ordinary high-water mark. And furthermore, that if the State did not take by force of her sovereign right, she acquired a good title to the land known as Duncan's island by the act of Congress to reclaim swamp lands. These claims the State conveyed by a statute to the city of St. Louis, and that corporation conveyed them to Jones, the plaintiff in error.
 
 
 109
 Soulard claims under the corporation of the St. Louis schools. The school survey No. 404 contains 78 96-100ths acres, including the land in controversy.
 
 
 110
 The town of St. Louis was incorporated in 1809 by the Common Pleas Court of St. Louis county, in conformity to an act of the Territorial Legislature passed in 1808, and the only contested question in the cause is, whether the eastern line of the corporation extends to the middle thread of the Mississippi river, or is limited to the bank of the channel. The calls for boundary in the charter are, 'beginning at Antoine Roy's mill on the bank of the Mississippi; thence running sixty arpens west; thence south on said line of sixty arpens in the rear, until the same comes to the Barrieu Donoyer; thence due south until it comes to the Sugar-loaf; thence due east to the Mississippi; from thence by the Mississippi, to the place first mentioned.'
 
 
 111
 The expression used in designating boundary on the closing line in the charter is as apt to confer riparian rights on the proprietor of the tract of seventy-nine acres as the call could well be, unless the last call had been for the middle of the river.
 
 
 112
 Many authorities resting on adjudged cases have been adduced to us in the printed argument presented by the counsel of the defendant in error, to show that from the days of Sir Matthew Hale to the present time all grants of land bounded by fresh-water rivers, where the expressions designating the water-line are general, confer the proprietorship on the grantee to the middle thread of the stream, and entitle him to the accretions.
 
 
 113
 We think this as a general rule too well settled, as part of the American and English law of real property, to be open to discussion; and the inquiry here is, whether the rule applies to so great and public a water-course as the Mississippi is, at the city of St. Louis? The land grant to which the accretion attached has nothing peculiar in it to form an exemption from the rule; it is an irregular piece of land, of seventy-nine acres, found vacant by the surveyor general, and surveyed by him as a school lot, in conformity to the act of 1812.
 
 
 114
 The doctrine, that on rivers where the tide ebbs and flows, grants of land are bounded by ordinary high-water mark, has no application in this case; nor does the size of the river alter the rule. To hold that it did, would be a dangerous tampering with riparian rights, involving litigation concerning the size of rivers as matter of fact, rather than proceeding on established principles of law.
 
 
 115
 1. We are of the opinion that the city charter of St. Louis, of 1809, extends to the eastern boundary of the State of Missouri, in the middle of the river Mississippi. Dovaston v. Payne, 2 Smith's Leading Cases, 225.
 
 
 116
 2. That Duncan's entry set up in defence in the court below is void, as this court held in the case of Kissell v. the St. Louis Schools, 18 How.
 
 
 117
 3. That the school corporation held the land in dispute, with power to sell and convey the same in fee to the defendant in error, Soulard, in execution of their trust.
 
 
 118
 It is ordered that the judgment of the Circuit Court be affirmed.