# Ohio Nisi Prius Reports

## NEW SERIES—VOLUME XXIII.

Causes Argued and Determined in the Superior, Common Pleas,
Probate and Insolvency Courts of Ohio.

## JURISDICTION OF AN OHIO MUNICIPALITY BELOW LOW WATER MARK OF THE OHIO RIVER.

Court of Common Pleas of Hamilton County.

FREDERICK DICKOW v. CITY OF CINCINNATI. (No. 171903.

C. G. BROOKS v. CITY OF CINCINNATI. No. 171904.

CHARLES G. BROOKS, PRESIDENT CONEY ISLAND COMPANY v.
CITY OF CINCINNATI. No. 172794.

Decided, June, 1920.

*Steamboat Lying at Municipal Wharf Below Low Water Mark in the Ohio River—Subject to Municipal Smoke Abatement Ordinance—Constitutionality of the Cincinnati Ordinance—Police Power and Interstate Commerce—When Officers and Employees of a Corporation May be Held Criminally Liable for Creation of a Nuisance.*

1. A municipal ordinance prescribing a test for determining dense smoke, declaring that the emission or escape of smoke within the city of Cincinnati of a greater degree of darkness from any smoke stack of any boat, etc., to be a nuisance punishable by fine and imprisonment, is constitutional and valid.

2. A boat anchored in the Ohio river, opposite the Cincinnati shore, is within the municipal boundaries without regard to whether it

is above or below low water mark; and such a boat is therefore within the legislative, executive and judicial jurisdiction of the city of Cincinnati subject to the paramount jurisdiction of the federal government over admirality and interstate commerce subjects and the concurrent jurisdiction of Kentucky.

3. The ordinance in question comes within the police power of the state, does not regulate interstate commerce and only affects it incidentally, does not conflict with the act of Congress regulating steam vessels, and is therefore operative over the waters of the Ohio river opposite the Cincinnati shore.

4. To hold the officers or employees of a corporation criminally liable for a nuisance created in the conduct of the corporate business, it must appear that the nuisance was created in the careful conduct of the business in the usual and customary way, or that the officer or agent knowing of the existence of the nuisance and having power to abate it, allowed it to continue.

*Shaffer & Williams*, for plaintiffs in error.

*Chauncey D. Pichel*, Asst. City Solicitor, for the city.

*Robert S. Marx*, orally on behalf of Smoke Abatement League and as *amicus curiae*.

*Murray Seasongood and Robert P. Goldman*, on brief for the Smoke Abatement League and *amici curiae*.

MATTHEWS, J.

The plaintiff in error, Frederick Dickow, was engineer on the steamer Island Queen, and the plaintiff in error, C. G. Brooks, was president of the Coney Island Company, a corporation that owned the Island Queen, a pleasure boat that was chiefly used in transporting passengers from the wharf-boat in the Ohio river at the foot of Broadway, Cincinnati, Ohio, to the landing owned by the Coney Island Company at its pleasure resort known as Coney Island, also in the city of Cincinnati, Ohio.

The plaintiff in error, Frederick Dickow, and C. G. Brooks, were charged by separate affidavit with having violated on June 26, 1919, an ordinance of the city of Cincinnati, prohibiting the creation of a nuisance by causing, or permitting, or suffering the emission or escape from the smoke stack of any boat, of smoke of a greater degree of darkness than No. 1 scale, as that term was defined to mean in the ordinance, for a period in excess

of the time permitted by the ordinance. See Sections 309, 310, 311 of the code of ordinances of the city of Cincinnati. In the affidavits the specific charge was that they caused, permitted, or suffered the emission or escape of said smoke from a certain steel stack of the steamer, Island Queen, located at the foot of Broadway street, tied to a wharf-boat. The charges against the two defendants were consolidated and tried together in the municipal court, and both defendants were found guilty. Charles S. Brooks was later charged by affidavit with having violated said ordinance on August 7, 1919, by causing, permitting, or suffering the emission or escape of smoke of a greater degree of darkness and for a longer period than was permitted by the ordinance, from the steel stack of the Island Queen, located in the same place as that charged in the prior affidavit. A trial was had in the municipal court and he was found guilty as charged. Error was prosecuted to this court by the defendants below, and because of the similarity of the charges and the general identity of facts disclosed by the record making most of the questions raised common to all the cases, they were presented together to this court and will be disposed of together.

In the first place the cases raise the question of the jurisdiction of the state of Ohio over the water of the Ohio river. This question has received the attention of the courts of the states along the Ohio river, and of the Supreme Court of the United States almost from the creation of the Federal union. After the Revolutionary war and when the Federal government was in process of formation, the question arose as to the ownership of the vast tracts of land to the northwest of the Ohio river. The Royal Charter held by Virginia included these lands, but yielding to the recommendation of Congress, Virginia in 1781, conveyed to the United States all the territory northwest of the Ohio river, subject to certain conditions, one of which was that the ceded territory should be laid out and formed into states and, construing this Virginia grant, the Supreme Court of the United States in *Handly's Lessee* v. *Anthony et al*, 5 Wheat., 374, held that the boundary of the state of Kentucky extended to low water mark on the western, or northwestern side of the

Ohio river. Subsequent to the cession the Legislature of Virginia in 1789, by an act known as the Virginia Compact, which proposed the creation of the state of Kentucky out of what was then a part of Virginia, stipulated that the use and navigation of the Ohio river so far as the territory of the proposed state, or the territory shall remain within the limits of Virginia, lies thereon, shall be free and common to the citizens of the United States, and the respective jurisdictions of Virginia and of the proposed states on the Ohio river shall be concurrent only with the states which may possess the opposite shores of the Ohio river. See 13 Hening, St. L., 17. Congress accepted this legislation by Virginia, and the state of Kentucky was created.

This grant by Virginia and the Virginia Compact have been construed by various courts. In the case of *State* v. *Hoppess,* 1 Ohio Dec. Reprint, 105, it was held that a slave escaping from a boat on the Ohio river, lying above low water mark on the Ohio side, was nevertheless a fugitive slave within the meaning of the Federal Constitution under the act of Congress, and could be reclaimed by the owner; and upon the subject of jurisdiction on the waters of the Ohio the court at page 116 says:

"Thus, for the service of civil and criminal process, it has been repeatedly decided in our courts that the jurisdiction of Ohio and Kentucky was concurrent over the water within the banks of the river, without reference to high or low water mark. True, it has been decided if a boat was attached to either shore, for the purpose of civil or criminal process, the jurisdiction was exclusive in the state to which it was attached."

The court held in the particular case that inasmuch as the slave had escaped from the boat while navigating the Ohio river, the master could not be said to have brought the slave within the state of Ohio, and that to so hold would be contrary to the spirit of the Virginia Compact, which contemplated the river as a public highway, for the purpose of which it was necessary to use the shore as an incident to navigation.

In the case of *Wedding* v. *Meyler,* 192 U. S., 573, it was held that the state of Indiana has concurrent jurisdiction with Kentucky on the Ohio river opposite its shore below low water mark.

From these decisions and many others that could be cited it is clear that while the state of Kentucky owns the bed of the Ohio river to low water mark on the northwestern shore, its jurisdiction on the waters of the Ohio river is concurrent only with that of the states on the northwestern shore of the river. Ohio has the same authority and control on the waters of the Ohio opposite its shore as Kentucky has, and can legislate on the subject of civil and criminal rights and duties on its waters, and execute such laws thereon to the same extent as Kentucky can. This power or jurisdiction in the state of Ohio is conceded by the plaintiffs in error. They deny, however, that a municipal corporation in the state of Ohio, having as one of its boundaries the Ohio river, can legislate by municipal ordinance effective upon the waters of the Ohio river, and that inasmuch as the defendants are charged only with the violation of a municipal ordinance of the city of Cincinnati, to hold that such ordinance was operative on the waters of the Ohio river would be giving to a municipal ordinance extra-territorial operation without any express sanction therefor by the Legislature of the state of Ohio.

It is undoubtedly the law that a municipal corporation can not exercise any extra-territorial authority or jurisdiction without the express authorization of the Legislature of the state from which it derives its being, and if to give this ordinance operation over the waters of the Ohio river opposite Cincinnati is giving the ordinances of the city of Cincinnati operation outside of the corporate limits, the court could not so hold without deciding contrary to the uniform tenor of the decisions.

This situation raises the question of what is included within the territorial confines of the city of Cincinnati. The boundaries of that city as defined by municipal ordinance, as well as by the plats and descriptions, forming the basis of its creation and of which the court takes judicial notice, describes its territorial limits as "Beginning at the junction of the Ohio River," etc., and ends with, "thence southwestwardly along the northerly line of Three Mile road to the Ohio river; thence southwestwardly following the meanderings of the Ohio river to the

western boundary line of the former village of Delhi, the place of beginning.'' In other words, the Ohio river is made by law the southerly boundary of the municipal corporation of Cincinnati.

It is a general rule of conveyancing that where property is described by reference to monuments the grantee takes all the interest or title of the grantor in the monument. Where a way or stream is referred to as constituting one of the boundary lines the grantee takes all the interest of the grantor in that way or stream. If the grantor owns to the middle of the stream or way the conveyance carries the title of the grantee to the middle, unless by express words the grantor shows an intent to limit the grant to the margin of the way or stream. As was said by the court in *Luce* v. *Carley*, 24 Wend., 451:

"Where the grant is so framed as to touch the water of the river, and the parties do not expressly except the river, if it be above tide, one half the bed of the stream is included by construction of law. If the parties mean to exclude it, they should do so by express exception. Without adhering rigidly to such construction, water gores would be multiplied by thousands along our inland streams small and great, the intention of parties would be continually violated, and litigation become interminable."

The Ohio cases are uniform to the same effect. *Day* v. *Railway*, 44 Ohio St., 406; *Railway* v. *Platt*, 53 Ohio St., 254; *Chesbrough* v. *Head*, 3 C. C. (N. S.), 516; affirmed without opinion in 69 Ohio St., 542.

While ordinarily the grant only carries to the middle of the stream, that is because the presumption is that the parties on opposite sides of a stream or way own to the middle. But where it appears that the grantor owned the entire way or stream, then the grant by implication of law carries title to the entire way or stream to the grantee. *In re Robbins*, 34 Minn., 99; *Watrous* v. *Southworth*, 5 Conn., 305; *Seery* v. *Waterbury*, 82 Conn., 567.

It is clear, therefore, that had the state of Ohio owned the fee simple title to the bed of the Ohio river, subject to navigation at the time the municipal corporation of the city of Cincin-

nati was created, the application of the rules of construction of private conveyance would carry the grant to the bed of the stream.   Do such rules of construction apply?

In the case of *Jones* v. *Soulard*, 24 How., 41, the Supreme Court of the United States had before it the construction of the language used in describing the boundaries of the city of St. Louis to determine whether that city was entitled to accretions to the shore of the Mississippi river, on the bank of which said city was and is located.   The court held as stated in the syllabus:

"The eastern line of the city of St. Louis, as it was incorporated in 1809, is as follows: from the Sugar loaf due east to the Mississippi; 'from thence, by the Mississippi, to the place first mentioned.'
"This last clause made the city a riparian proprietor upon the Mississippi, and, as such, it was entitled to all accretions as far out as the middle thread of the stream."

The same rule was applied in the case of *Coldspring Iron Works* v. *Inhabitants of Tolland*, 63 Mass., 492, where it was held that:

"Under a statute by which a stream not navigable is made the boundary of an incorporated territory, the center of the stream, and not the edge or margin, is the true boundary line; and this is so although the monuments are described as standing on the margin or bank of the stream."

At page 496, the court says:

"The same construction that is given to grants is given to statutes which prescribe the boundaries of incorporated territories.   *Inhabitants of Ipswick*, 13 Pick., 431."

To the same effect is *Flynn* v. *City of Boston*, 153 Mass., 372.

It can be safely said, therefore, that in determining the boundaries of municipal corporations, at least so far as ownership in corporeal property is concerned, the same construction is to be given to language that would be given were that language used in a deed between private individuals, and that

where one of the boundaries is a river, the proprietary interest of the state in the bed of that river will, by implication of law, be included in the territory erected into a municipality, unless there is express language of exclusion. Does that same rule referable to the physical bed of the river apply to the intangible right or jurisdiction on the water of the river? The Virginia Compact granted to the states "which may possess the opposite shores of the said river" concurrent jurisdiction with Virginia and Kentucky. In other words, so far as jurisdiction on the waters of the river is concerned the state of Ohio, because of its possession of the *shore,* exercises it not to the exclusion of all others, but in common with the states opposite, and of course, subject to delegated jurisdiction of the United States. If the state of Ohio and the states opposite were co-tenants of the physical bed of the Ohio river, it is clear from the authorities that a grant by the state of Ohio of land bounded by the Ohio river would, by implication of law, carry with it the right of Ohio in the bed of the river, which it owned in common with the states opposite.

Now, does the fact that the right of the state of Ohio in the Ohio river is not in the ownership of the bed of the river, but in its control or jurisdiction on the surface of the water of the river, prevent the application of these rules of construction? In other words, is there such a variance in substance or legal effect between ownership of tangible property, and jurisdiction over that property without ownership in the common acceptation of that term, as to call for the application of some other rule of construction? In the legal sense, property does not necessarily mean the tangible thing. All property in one aspect is intangible, although it may be referable to land or tangible chattels. Property is the right and interest which a man has in lands and chattels to the exclusion of others. As is stated in *Low* v. *Rees Printing Co.,* 24 L. R. A. (Neb.), 702, at 709:

"Property in its broader sense, is not the physical thing which may be the subject of ownership, but is the right of dominion, possession and power of disposition which may be acquired over it."

The same definition is stated in many cases, among which is *Rigney* v. *Chicago*, 102 Ill., 64. And nowhere more than in Ohio have the courts developed and emphasized the incorporeal character of rights, in and to corporeal property, and accorded protection to such incorporeal rights when the general ownership or title was in the sovereign state. *Crawford* v. *Delaware*, 7 Ohio St., 460 at 470; *Kinnear Mfg. Co.* v. *Beatty*, 65 Ohio St., 264, at 282; *Traction Co.* v. *Parish*, 67 Ohio St., 181, at 190.

When property rights are viewed in this sense the distinction between them and jurisdiction over a given locality exercised by a sovereign becomes vague. "Jurisdiction" which was given the states possessing the "shore" of the Ohio river, is nothing more than the right to prescribe and enforce the rules of conduct to be observed on the waters of that river. It is the right of dominion over them, and is of the same incorporeal character as are the rights of property. While the Virginia grant of cession limited the title of the states created out of the northwest territory to the bank of the river above low water mark, the Virginia Compact did give to these states possessed of the "shore" of the Ohio river certain rights on and over the waters of the river which, whether denominated as jurisdiction, dominion or property, did attach to the northwest "shore" of the river; and when such a state created a political subdivision or municipal corporation, bounding it by the river, it is the opinion of the court that that grant carried with it to the political subdivision or municipal corporation the jurisdiction over the water of the Ohio river to the extent that the political subdivision or municipal corporation was given the right to exercise jurisdiction as an agency of the state within its boundaries.

In creating, or permitting to be created a municipality bounded by the Ohio river, the state was conveying or bestowing upon that municipality governmental powers principally, and any transfer of rights in property was merely incidental and all were given to be held in trust for the state to which they all —governmental and proprietary—revert when the municipality ceases to exist. The principal subject of conveyance in the

creation of a municipality being governmental powers, it is of the same character of right that the state has over the waters of the Ohio river, and the state having the power to confer such authority upon municipal corporations within prescribed boundaries there seems no reason to hold otherwise than that such a grant includes the power or jurisdiction to the full limit of the boundaries in so far as the state has such jurisdiction to bestow.

In *State* v. *Faudre,* 63 L. R. A. (W. Va.), 877, at 879, the court approved this statement of the power given by the Virginia Compact to the states possessing the ''shore'' of the Ohio river:

''Jurisdiction unqualified being, as it is, the sovereign authority to make, decide on, and execute laws, a concurrence of jurisdiction must entitle Indiana to as much power—legislative, judicial and executive—as that possessed by Kentucky over so much of the Ohio river as flows between them.''

And in *State* v. *Faudre, supra,* the Supreme Court of West Virginia gave full effect to an ordinance of the city of Gallipolis, granting a ferry license to Faudre, to the same extent as though it had been granted directly by the state of Ohio.

The conclusion to which the court has come on this subject makes it unnecessary to consider the question of whether the Island Queen was at the times in question north or south of low water mark. The trial court in cases No. 171903, and No. 171904, found as a matter of fact that the Island Queen was north on the Ohio side of low water mark at the time, and in case No. 172794, the court made no finding upon that subject at all, but found generally that the defendant was guilty. This court reviewing the judgments of the municipal court would not be disposed to disturb the findings of that court upon the question of fact, where the evidence was as it is in these cases, conflicting, but being of the opinion that it is immaterial whether the Island Queen was north or south of low water mark, the court has not examined the record in either of these cases for the purpose of determining whether the finding of the municipal court upon that subject is so manifestly against the evidence

as to have required a reversal in the event the correctness of the judgments below depended thereon.

The plaintiff in error offered to prove in the trial court that the Island Queen, at the time in question, was being operated under a license issued to it by the United States Government under Sections 8151 to 8254 of the United States Compiled Statutes of 1918. The law provides for the inspection and licensing of steam vessels engaged in navigation on the navigable rivers. It is urged that even assuming that the city of Cincinnati has jurisdiction over the waters of the Ohio river touching the Cincinnati shore, that jurisdiction is subordinate to the maritime and interstate commerce jurisdiction of the United States Government, and that the Federal Government by the aforesaid laws has assumed to legislate on the subject of steam vessels on the waters of the Ohio river, and that to construe this ordinance as applicable to steam vessels on the waters of the Ohio river, would cause it to conflict with the Federal law and thereby render it unconstitutional, which is not permissible under established rules of construction, and if permissible the ordinance would be thereby invalidated and the convictions erroneous. If the premise is correct the conclusion is unavoidable.

In the case of *Burrows* v. *Delta Transportation Co.,* 29 L. R. A. (Mich.), 468, the Supreme Court of Michigan had before it a case involving the validity of a state statute requiring all vessels using wood for fuel while navigating the waters of the state to be provided with suitable fire screens to prevent the escape of sparks. At that time there was an act of Congress creating a board of inspectors of vessels, with certain authority to require conformity with its decisions. The Supreme Court of Michigan held in that case that,

"A state statute requiring all vessels using wood or fuel while navigating waters of the state, to be provided with suitable fire screens, does not conflict with acts of Congress, or regulations of supervising inspectors, and is not an interference with interstate commerce."

In the case of *Harmon* v. *City of Chicago,* 110 Ill., 400, the court had before it the question of the validity of a city ordi-

nance declaring dense smoke to be a public nuisance, and also the question of the applicability of that ordinance to the owner of a boat engaged in interstate commerce, and the court held:

"Where a conflict may arise between a state and the general government as to legislation committed to Congress, Federal authority must always prevail, for the reason that legislation in pursuance of the Constitution of the United States is the supreme law of the land. In some instances the state and general government may exercise concurrent jurisdiction in certain matters, and until the general government sees proper to act, state legislation is warranted, and the power of the state over such subjects is plenary.

"The existence of a power in Congress to control harbors, and the towing in and out merchant vessels engaged in commerce with foreign nations and with the several states, does not of itself prevent local legislation for the security of property, and the health, comfort and convenience of the people in a municipality. It is only repugnant and interfering state legislation that must give way to the paramount laws of Congress constitutionally enacted.

"A state has all power necessary for the protection of the property, health and comfort of the public, and it may delegate this power to local municipalities in such measure as may be deemed desirable for the best interests of the public; and the state may resume it again when deemed expedient."

And at page 407, the court says:

"But does this ordinance impose any restraint on the use of such vessels, although engaged in general commerce, other than is consistent with law? It is thought it does not. At most it purports only to regulate their use in such manner as may not produce effects detrimental to property and business, and become a personal annoyance to the public at large within the city, and that is allowable to be done."

And at page 408:

"Regulating the use of fuel, or, what is the same thing, requiring owners or managers of tug-boats to so use their vessels so as not to create a dense smoke, which it is conceded would be an annoyance to the public at large, is in no sense imposing any restraint upon commerce, nor does it in any manner conflict with the powers of Congress under what is called the 'commerce clause' under the Constitution of the United States."

Whenever the state of Ohio exercises any jurisdiction over the waters of the Ohio river, it touches and affects the agencies of interstate commerce. To hold that the mere fact that a state law operates upon the instrumentalities of interstate commerce, and incidentally affects interstate commerce renders the law unconstitutional, would deprive the state of all jurisdiction over the waters of the Ohio river and render the grant made by Virginia, by and with the consent of the Federal Government, of concurrent jurisdiction with the state of Ohio, meaningless. It is only where the state law in effect regulates interstate commerce that it is in violation of the Federal Constitution. The existence of the power in the Federal Government to regulate interstate commerce does not in any sense deprive the state of its police power to make and enforce laws to protect the public health, public safety and the public morals. 5 Rulings Case Law, 702 and 703. Crimes, as defined by Ohio statutes, committed by those engaged in interstate commerce on the Ohio river are punishable by the state of Ohio when those acts violate the criminal law of this state, and the court can see no distinction between the commission of the crime of creating a nuisance by the escape of smoke upon the Ohio river and any other class of crimes.

It does not appear from this record that there was anything that would prevent the Coney Island Company from refraining from creating, or having created, or from abating this nuisance. That the state criminal laws are binding upon those engaged in interstate commerce, has been uniformly held. *Wiggins Ferry Co.* v. *Reading,* 24 Ill. App., 260; *State* v. *Cameron,* 2 Chand. (Wis.), 172; *Carlisle* v. *State,* 32 Ind., 55; *Welsch* v. *State,* 126 Ind., 71; *State* v. *Mullen,* 35 Iowa, 199.

The constitutionality of municipal ordinances declaring dense smoke to be a nuisance, and prescribing tests for determining the density of smoke, has been upheld by the courts against the charge that they violated the due process, equal protection, and private property inviolability, clauses of federal and state constitutions. *Northwestern Laundry Co. v. Des Moines,* 239 U. S., 486; *Harmon* v. *Chicago, supra,* and *Cincinnati* v. *Burk-*

hardt, 10 C. C. (N.S.) 495. In the latter case the ordinance prescribed a scale for measuring the density of smoke similar to that prescribed in the ordinance now under consideration. The fact that a law prescribes such a standard of conduct that the determination of whether or not any specified conduct conforms to the standard, depends upon the opinion of the triers of the facts, and therefore as variable as the types of mind, does not render the law unconstitutional, was held in the case of *State* v. *Schaeffer,* 96 Ohio St., 217.

The ordinance upon which this prosecution is based declares that smoke of a certain degree of darkness shall be held to be dense smoke, and the emission or escape thereof *within* the city of Cincinnati from any smoke stack is declared a *nuisance,* and that any person, firm or corporation, or any employee thereof, who *shall create or cause the nuisance,* or who shall *permit* or *suffer* the same to exist, shall be deemed guilty of a misdemeanor.

What is meant by the words, "within the city of Cincinnati?" If the court is correct in the conclusion that the state of Ohio had power to and did clothe the city of Cincinnati with certain jurisdiction over the Ohio river, and that by a proper construction of the description of the territory, the municipality extends over the waters of the river for certain purposes, then an act committed on the waters of the river would be committed legally "within" the city of Cincinnati. It has been uniformly held that where a crime was committed on the Ohio river, venue was properly laid in the county possessing the opposite shore. *State* v. *Savars,* 15 C. C. (N. S.), 65; *State* v. *Kendle,* 8 N. P. (N.S.), 109, and many cases in other jurisdictions. If it were not true that Cincinnati had jurisdiction over the place where the nuisance originated, the court would be inclined to hold that a proper construction of the ordinance makes it inhibit the smoke nuisance within the city, and that the reference to the smoke stack or chimney was simply for the purpose of designating the source or instrumentality by means of which the nuisance was created. The smoke in the air coming in contact with the property in Cincinnati, and being in the air breathed by persons in Cincinnati, thereby affecting the public health, comfort

and property, was the nuisance legislated against and not the mere emission or escape of the smoke regardless of whether it was immediately reconfined or allowed to pollute the air. Unless smoke was in fact a nuisance, it could not be made so by an arbitrary legislative mandate. *Harmon* v. *Chicago, supra; Cincinnati* v. *Burkhardt, supra.* If this construction is correct, then the offense was committed where the smoke nuisance took effect, and that was within Cincinnati, exclusive of waters of the Ohio river. *Strawboard Co.* v. *State,* 70 Ohio St., 140.

A decision of the case also requires a construction of the words "permit or suffer," as used in this ordinance. The defendants did not individually own the Island Queen. It is owned by a corporation, of which the defendant Brooks was president, and the defendant Dickow an employee. What relation to the nuisance must be shown in order to hold officers and employees of the corporation under this ordinance for creating or causing or permitting or suffering the nuisance?

In the case of *Cincinnati* v. *Burkhardt, supra,* it was held:

"The defendant Burkhardt is charged, as president and general manager of the Gibson House hotel, with unlawfully permitting the emission and escape of smoke. It is admitted in the record that he is president and general manager of the A. G. Corre Hotel Company, which runs the Gibson House, and was at the time complained of. But it does not appear that he personally permitted, or had anything to do with the nuisance of the smoke. Under the ordinance the corporation permitting the emission of smoke, or the employee causing it, should have been prosecuted." ..... . . .... ..

This question has frequently arisen when it was sought to hold the landlord on account of gambling conducted on his premises, and a case of this character is *Thompson* v. *Ackerman,* 21 C. C., 740, the syllabus of which is as follows:

"An owner of leased premises who has knowledge that the lessee is using the same for gambling purposes and who does nothing whatever to hinder or prevent the lessee in such use, must be held to 'knowingly permit' such use within the meaning of Section 4275 of the Revised Statutes."

And at page 746 the court say:

" 'To permit' means either, first, 'to suffer or allow to be,' come to pass or take place, 'by tacit consent or by not prohibiting or hindering,' or second, 'to grant leave or liberty to, by express consent; to allow expressly.' If being in actual possession he permitted within the one meaning or the other, he would be liable criminally under the gambling statute, Section 3682 of the Revised Statutes."

In the case of *Larson* v. *Christianson,* 14 N. Dak., 476, 481, the court says:

"The word 'permit' as here used, means that the unlawful use is allowed to continue after knowledge or notice thereof. It does not mean that the nuisance exists, but that it exists with the consent or acquiescence of the owner."

In *People* v. *Conness,* 150 Cal., 114, at 121, the court says:

"The word 'allow' here means more than mere 'abstinence from prevention,' as the court below defined it in an instruction given to the jury. It has almost the identical meaning of the word 'permit,' also used in the statute. It implies some sort of assent on the part of the husband. There must be some active wish, or at least willingness, in his mind, after he had knowledge of her presence in the house, that she should continue there; something more than mere indifference to her whereabouts or passing sufferance in a case where the circumstances do not call upon him to interfere with her conduct."

The rule as to the criminal liability of an officer of a corporation for acts done in relation to the corporate business, is stated in Vol. 4, of Fletcher's Cyclopedia Corporations, Section 2725, in this language:  .

"A corporate officer is criminally liable where he is the actual present and efficient action behind the corporation. On the other hand, the officer is generally held not liable unless he participates in the unlawful act, either directly or as an aider, abettor or accessory, and this is so even though the offense is the violation of a statute which imposes imprisonment as a penalty. A corporate officer without regard to his position, is ordinarily not criminally liable for corporate acts performed by other officers or agents of the corporation. But it has been held

that it is not necessary to the conviction of an officer for nuisance that he should have been actually engaged in work upon the premises.''

Many cases are cited by the author to sustain the various propositions stated in the text. The author cites *People* v. *Detroit White Lead Works*, 82 Mich., 471; 9 L. R. A., 722, as sustaining the proposition stated in the last sentence quoted. In that case it was found as a fact however, that the nuisance was caused by a business while being conducted in a careful manner without anything being done that was not a necessary and reasonable incident to its proper conduct. The case of *Overland Cotton Mill Co.* v. *People*, 32 Colo., 263, is also referred to by the same author as going to the extreme limit in holding corporate officers criminally. It was a case in which a corporate officer was held liable for violating a statute that prohibited any person from employing a child under fourteen years of age in a factory, and the court held that inasmuch as the defendant had authority to hire employees, and because of his relation to the corporation he either knew or by the exercise of reasonable care should have known, that the minor under the prohibited age was in the employ of the corporation, he had been properly convicted.

The rule deducible from the authorities seems to be that where a nuisance is created upon premises in the possession of a corporation, those actively engaged in the creation of the nuisance are liable criminally; and that where the nuisance is caused by the conduct of the business in the usual and customary way, those officers in control of the corporation must be deemed to have created or caused the nuisance, but, that an officer or employee of the corporation not participating in fact or by implication of law in the creation of the nuisance is not liable unless knowing of the existence of the nuisance and having power to abate it, he allows it to continue.

The court having already concluded that the record discloses proof of the *corpus delicti* and that the venue had been proplaid, it remains to apply the law to the facts disclosed by the records to determine whether the defendants have been properly convicted of the commission of the offenses.

In case No. 171904, the only connection of C. S. Brooks with the offense is the admission that at the time the offense was committed he was president of the corporation owning the Island Queen, and was actually engaged in the operation of the boat.   This admission goes no further than the admission contained in the record of the case of *Cincinnati* v. *Burkhardt,* 10 C. C. (N.S.), 495, the pertinent part of which has already been quoted, and the court concluded that the president of the corporation was not liable.

The authority of that case is binding upon this court, and in accordance therewith, the court holds that the defendant Brooks in case No. 171904, was improperly convicted and said conviction is therefore reversed.

In case No. 171903, it was admitted that the defendant Dickow was the chief engineer and actually engaged in the operation of the Island Queen, and in addition thereto, that he was working as chief engineer on the Island Queen at the time the offense was committed and while it was moored at the foot of Broadway.   The defendant Dickow being chief engineer and being personally present at the time and place the offense was committed, is evidence that he participated in the creation of the nuisance, and knowing of its existence and having power to abate it, allowed it to continue.

The judgment of the municipal court is affirmed in this case, No. 171903.

In case No. 172794, the defendant Brooks was shown to have been the president of the corporation owing the Island Queen, actively participating in the management of its business, and in addition thereto, had several times prior to the date laid in the affidavit, been notified on various occasions that the Island Queen was being so operated as to cause a smoke nuisance, in violation of the municipal ordinance, and warned to take the proper precautions to prevent or abate the nuisance.   The record also shows that the nuisance was continued intermittently for some months and that the defendant took no effective means either by installation of new appliances or by prohibitory commands to the employees so as to prevent a recurrence of the

nuisance, and the court therefore holds that under the law, the record discloses evidence against the defendant Brooks in that case, that knowing of the existence of the nuisance and having power to prevent its recurrence he refrained from doing so, and therefore, the judgment of the municipal court in case No. 173794, finding him guilty of a violation of this ordinance should be affirmed.