WILLIAM KINKEAD V. C. W. TURGEON ET AL.*

FILED OCTOBER 5, 1905.   No. 13,904.

1. **Navigable Waters**: RIPARIAN PROPRIETORS.   The title to the bed of a navigable river in Nebraska is in the state, and the rights of a riparian proprietor on such stream are bounded by the banks of the river.

2. **Case** of *Bouvier v. Stricklett*, 40 Neb. 792, criticised.

ERROR to the district court for Dakota county: GUY T. GRAVES, JUDGE.   *Affirmed.*

*John T. Spencer* and *R. E. Evans*, for plaintiff in error.

*J. J. McAllister, Edwin J. Stason* and *J. C. McConkey*, contra.

OLDHAM, C.

This was a suit in ejectment, which was tried to the court and a jury on the following stipulation of facts: "It is hereby stipulated by and between the parties hereto: That the plaintiff is, and in 1876 was, the owner of so much of the land described in his petition as was above the line of ordinary high water mark of the Missouri river in May, 1876; that in May, 1876, the Missouri river, which

---

* Rehearing allowed.   See opinion, p. 580, *post*.

is a navigable state boundary river, suddenly abandoned its permanent channel adjacent to plaintiff's said land, leaving its former channel and forming a new channel by suddenly cutting through a neck of land to the south of plaintiff's said land; that all the land in controversy in this action, and occupied by the defendants C. W. Turgeon, V. C. Turgeon, N. Turgeon, Charles Bray, and Caleb Marsh at the time this action was commenced and at the present time, is wholly below and outside of the ordinary high water mark of the Missouri river, as it flowed at the time of said sudden change, and cut off the permanent bed of said river, and is now the dry, abandoned bed of the said river; that the lands occupied by the defendants at the commencement of this action and at the present time constitute the abandoned river bed of the Missouri river as said river flowed prior to the cut-off in 1876, being that part of said bed between the center of the channel where said river then ran and the high bank of the land owned and occupied by the plaintiff on the Nebraska side, and described in plaintiff's petition." The court directed a verdict for the defendants. There was judgment on the verdict, and to set aside this judgment plaintiff brings error to this court.

The stipulation of facts in this case is exceedingly meager, and the most that can be gathered from it is that in and since 1876 the plaintiff was the owner of riparian lands on the Missouri river, a navigable stream; that, by a sudden change of channel, the waters receded from plaintiff's land and left an abandoned river bottom between the former high water mark of the river and the middle of its former channel, which is now occupied by the defendants. Plaintiff's claim to the land rests solely on the doctrine that the riparian owners of lands bordering on the Missouri river take to the middle thread of the stream, notwithstanding the fact of its navigability. Had the addition to these lands formed by gradual accretion or reliction, a different question would have been presented, since even the riparian owners on tide-water rivers at common law

took the alluvium formed by slow and imperceptible accre-
tion. But under the stipulation the lands in question
were admitted to have been formed by a sudden change of
the channel of the river. Consequently, plaintiff's claim
to the bed of the river turns on his right as a riparian
owner to take to the middle thread of a navigable river
that bounds his land. At common law the title to the bed
of navigable tide-water rivers is in the king, who holds it
in trust for his subjects. In the states of the American
Union in which the English common law prevails there is
a conflict of opinions in the courts of last resort as to
whether the title to the beds of fresh-water rivers, which
are navigable in fact, remains in the state or is in the
riparian owners of the stream. This conflict arose when
some of the colonial courts, and later the supreme court of
the United States, made a departure from the common
law test of navigability (that it should be a stream in
which the tide ebbs and flows, or an "arm of the sea"), and
made the test a practical question of fact as to whether or
not the stream was actually navigated. When this depart-
ure was made, the conflict arose in the different states as
to what rule should be applied to the ownership of the
beds of streams which were navigable in fact, but not at
common law.

As has been stated, at common law the bed of a river in
which the tide ebbed and flowed was held by the king,
while the title to the bed of all fresh-water rivers was in
the riparian owners. Some of the American courts,
notably Illinois, Connecticut, Delaware, Georgia, Ken-
tucky, Maryland and Maine, applied the doctrine that, as
these fresh-water streams were nonnavigable at common
law, the common law rule as to the title to fresh-water
streams should apply, and, consequently, that each ripa-
rian owner took to the middle thread of the stream. *Adams
v. Pease,* 2 Conn. 481; *Braxon v. Bressler,* 64 Ill. 488; *De-
laney v. Boston,* 2 Harr. (Del.) 489; *Hendrick v. Cook,* 4
Ga. 241. The opposite view found favor in the decisions
of the supreme courts of Pennsylvania, Iowa, Missouri,

Kansas, Minnesota, California, Nevada, Arkansas, Alabama, Tennessee, Indiana and others. *McManus v. Carmichael,* 3 Ia. 1; *Carson v. Blazer,* 2 Binn. (Pa.) 475; *Wood v. Fowler,* 26 Kan. 682; *Lamme v. Buse,* 70 Mo. 463; *Schurmeier v. St. Paul & P. R. Co.,* 10 Minn. 59, affirmed in supreme court of the United States, 7 Wall. (U. S.) 272; *Packer v. Bird,* 71 Cal. 134; *Shoemaker v. Hatch,* 13 Nev. 261; *Bullock v. Wilson,* 2 Port. (Ala.) 436; *St. Louis, I. M. & S. R. Co. v. Ramsey,* 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559; *Elder v. Burrus,* 6 Humph. (Tenn.) 358; *Bainbridge v. Sherlock,* 29 Ind. 364. This line of decisions proceeds on the theory that, as these streams, although not "arms of the sea," have been determined to be in fact navigable, the rule applicable to the bed of navigable tidewater streams at common law should govern them, and that, as the beds of navigable streams were reserved by the states when the constitution of the United States was adopted, the title to the beds of those rivers is in the states. The supreme court of the United States has held, in *Barney v. Keokuk,* 94 U. S. 324, and *Packer v. Bird,* 137 U. S. 661, that it is for the states to determine the question of the title to the beds of these rivers as between itself and the riparian proprietors.

It is plain that we stand at the parting of the ways in regard to the decisions of the state courts of this country on the question of title to river beds of the class in dispute. It is also apparent that each of these two divergent lines of authority start from a basis both sound and sane, and that the results of each of these lines of decisions have been sanctioned and approved by the supreme court of the United States. It then devolves upon us to examine carefully the decisions of our own court, and determine from them, if possible, which of the diverging paths we shall follow. The first decision of this court called to our attention is the case of *Lammers v. Nissen,* 4 Neb. 245. This was a dispute over lands on the banks of the Missouri river claimed as accretions by alluvial deposits. The case, however, was determined on the evidence, which tended to

show that the lands had not been formed as alluvium after the survey by the general government. The case also involved a question of meandered lines, not in point in the instant case. The next case cited is *Bissel v. Fletcher,* 19 Neb. 725. This was a controversy over riparian rights on a nonnavigable stream, and turned on a question of fact as to whether or not the lands claimed were formed by accretion. The question of riparian rights was next brought before this court in *Wiggenhorn v. Kountz,* 23 Neb. 690. There the dispute arose over the cutting of timber from an island in the Platte river. While the case was carefully considered and the authorities reviewed by the court, yet the question as to the title to the bed of a navigable river was not in issue and in no way adverted to. Consequently, this case is of little assistance in reaching a conclusion. In *Gill v. Lydick,* 40 Neb. 508, again the question was as to the right to accretions on the Missouri river, where the "river recedes slowly and imperceptibly, changing the channel of the stream and leaving the land dry theretofore covered by water." It was held that the alluvium so formed belonged to the riparian owner, but that, if the alteration takes places suddenly, the ownership would remain according to the former bounds. This case, while not in point, excludes any claim to the land by plaintiff in this cause of action on the doctrine of accretion. The next case, *Bouvier v. Stricklett,* 40 Neb. 792, was a dispute over an island in the Missouri river, claimed by the riparian owner as an accretion to his land. A judgment entered in the court below in favor of the defendant was affirmed by this court. In reaching the conclusion, many authorities are quoted in the opinion relative to the character of testimony necessary to establish the formation of land by accretion. For this purpose the decision of the supreme court of the United States in *County of St. Clair v. Lovingston,* 23 Wall. (U. S ) 46, is quoted from, because it discusses with great learning the peculiar character of the Missouri river with reference to changes in its channel. The result reached by the opinion was that the

40

evidence in the case then considered was not sufficient to show that the island had been formed by accretion. But, plainly by some oversight, it is said in the first lines of the fourth paragraph of the syllabus: "Where the middle of the channel of a stream of water constitutes the boundary line of a tract of land." While the syllabus, as a whole, properly states the law, yet so much of it as seems to hold that the title to lands on the banks of the Missouri river extends to the middle of the stream is purely *obiter dictum,* and unfounded on any question necessarily decided in the opinion. In *Clark v. Cambridge & A. I. & I. Co.,* 45 Neb. 798, a contest between a mill owner and an irrigation company over the waters of the Republican river, Post, J., speaking for the court, clearly indicated his adherence to the doctrine that the title to the beds of navigable rivers is in the state and not the riparian owners. But this question was not adjudicated, because it was held that the Republican river was a nonnavigable stream in fact, as well as at common law. In *Crawford Co. v. Hathaway,* 60 Neb. 754, 61 Neb. 317, 67 Neb. 325, again the contest was between a mill owner and an irrigation company over the use of the waters of a nonnavigable stream. The opinion in this case gives a very thorough and lucid discussion of the law of running waters and, while the bed of a navigable stream was not in issue, the author clearly expressed his views on this question. Citing many authorities for his position, he said:

"While this subject received slight attention in the case of *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.,* 45 Neb. 798, it was not determined, as a decision of the case turned on another point. As to navigable streams, the doctrine seems to be that the water and the soil thereunder belong to the state, and are under its sovereignty and domain, in trust for the people, and cannot, therefore, be the subject of a claim of property therein, or the right to the use thereof by an adjoining landowner. When the government, in its survey, runs meander lines along the banks of a stream and parts with its title to the

adjoining land, the boundary of which would be the high-water mark, then it would seem permissible to classify the stream as navigable, in which case the waters thereof and the bed thereunder would belong to the state, and be held by it in trust for the people. The waters in such streams would be held to be *publici juris,* and not subject to riparian claims by the adjoining landowner." *Crawford Co. v. Hathaway,* 67 Neb. 325, 350.

In *McBride v. Whitaker,* 65 Neb. 137, the controversy was over an island in the Platte river. The learned commissioner who wrote the opinion in the case specifically called attention to the fact that he was only determining the rights of the litigants in that case, from which no impression should go out that any claims of the state to the bed of the Platte river, or any unsurveyed island therein, were to be affected.

While it is probably true, as contended by counsel for plaintiff in error before us, that there has never been a final adjudication by this court of the rights of a riparian owner to take to the middle thread of the stream of the Missouri river, yet we think that the language used in rendering the opinions in *Clark v. Cambridge & A. I. & I. Co., supra,* and *Crawford Co. v. Hathaway, supra,* leaves little reason to doubt that Nebraska should be added to the list of states which hold that the title to the beds of fresh-water rivers, which are navigable in fact, is in the state, and that the right of the riparian owner is bounded by the banks of the stream.

We therefore recommend that the judgment of the district court be affirmed.

AMES and LETTON, CC., concur.

By the Court: For the reasons given in the foregoing opinion the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed November 10, 1906. *Reversed:*

1. **Common Law.** By statute so much of the common law of England as is applicable and not inconsistent with the constitution of the United States or the constitution and statutes of this state is in force in this state.

2. ———: RIPARIAN RIGHTS. Under the common law a riparian owner of lands on one side of a navigable river above the flow of the tide holds to the thread of the stream, subject to the public easement of navigation, and, if the river suddenly changes its channel and leaves its former bed, the boundary does not change, and he still holds to the same line. This is also the rule of of the civil law.

3. ———: ———. The common law relating to the rights of such riparian owners is applicable in this state, and is not inconsistent with the constitution or statutes of Nebraska or the constitution of the United States.

4. ———: ———. Where the Missouri river suddenly changes its course and abandons its former bed, the respective riparian owners are entitled to the possession and ownership of the soil formerly under its waters as far as the thread of the stream, and may maintain ejectment to oust squatters within such limits.

5. **Former opinion,** *ante,* **p. 573, vacated.**

LETTON, J.

The facts in this case are set forth in a former opinion by OLDHAM, C., reported *ante,* p. 573. On account of the fact that at the former hearing the commission was not favored with an oral argument of the case, and, further, for the reason that the question involved is of great public importance, a rehearing was allowed, and the case is again presented for consideration. As was pointed out in the former opinion, the question presented is here for the first time, though cases involving the rights of riparian owners to lands formed by accretion as alluvium have heretofore been considered by the court, and in deciding some of these cases certain expressions of opinion have been incidentally made by the writers of the several opin-

ions upon the question here presented. In none of them, however, was the determination of this question necessary to the disposition of the case, nor was any argument made or authorities presented upon the point. In *Clark v. Cambridge & A. I. & I. Co.*, 45 Neb. 798, the writer of the opinion indicates his personal views upon this question, but, since the case expressly holds that the Republican river is not a navigable stream, the expression was purely *obiter*. In *Crawford Co. v. Hathaway*, 67 Neb. 325, opinion by HOLCOMB, J., the writer of the opinion says:

"Whether the common law rule fixing the rights of riparian proprietors applies to the larger streams of the state, such as may be classed as interstate rivers, and along the banks of which meander lines have been run by the government in its survey of the public lands, presents an entirely different question, and it would seem that riparian rights would not attach to the waters of such rivers. A final determination of the question, however, is not here made, as this should be left to be decided in a proper case, where the subject is fairly presented and considered after opportunity for thorough investigation, aided by the researches and arguments of counsel."

It will be seen therefore that we approach the question unhampered by any previous adjudication.

There is an irreconcilable conflict between the decisions of the courts of different states of this country upon this question. From a somewhat extended examination of the various opinions, the writer believes that much of the confusion has resulted, partly from a mistaken idea as to what the supreme court of the United States had decided upon the question, partly from an idea that meander lines in maps of original surveys limited and bounded the estate of the riparian owner by the bank of the stream, and partly from a mistaken idea of the necessities of the case, based upon the differences in length, volume and navigability of the great rivers of America above tide water as compared with the inconsiderable extent of those English rivers which are navigable both above and below

the flow of the tide. See *Mayor and Aldermen of the City of Mobile v. Eslava,* 9 Porter (Ala.), 578; *McManus v. Carmichael,* 3 Ia. 1, 56; *Cooley v. Golden,* 117 Mo. 33.

The statute of this state provides: "So much of the common law of England as is applicable and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory is adopted and declared to be law within said territory." Comp. St. 1903, ch. 15*a*, sec. 1; Ann. St. 6950. In this connection we have said:

"The power of the courts to declare established doctrines of the common law inapplicable to this state should be used somewhat sparingly, and its exercise is not to be justified unless the inapplicability of a rule is general, extending to the whole or the greater part of the state, or, at least, to an area capable of definite judicial ascertainment. The common law rules as to the rights and duties of riparian owners are in force in every part of the state, except as altered or modified by statutes." *Meng v. Coffee,* 67 Neb. 500; *Slattery v. Harley,* 58 Neb. 575.

The statutory provision above set forth has been in force in the territory and state of Nebraska for over 50 years, and during that period of more than half a century the courts have declared the common law inapplicable in but few instances, and in several of the instances that portion of the common law held inapplicable to our changed conditions has been that part thereof consisting of statutes enacted long before the American revolution. *Meng v. Coffee, supra.* The cases in which the applicability of the common law as to the rights of riparian owners has been challenged heretofore in this state have all been concerned with the subject of the rights of the riparian owner to the unimpaired use of the water in the stream in resistance to a right claimed by appropriators to take it for purposes of irrigation or power; and the language used in *Meng v. Coffee, supra,* and other cases dealing with the same subject, while declaring as a general rule the su-

premacy of the common law doctrine, is hardly applicable upon the question here presented, for, when deciding that the right of the riparian owner to the use of the running water in a stream was superior to the right of a person seeking to divert the water from the stream for irrigation purposes, it can hardly be said that the court had in mind the question here presented as to the right of a riparian owner to an abandoned river bed of a navigable stream. We think the question, therefore, must be considered open and not settled by the prior decisions. They are worthy of consideration, however, and must be given weight as determining the general policy of this court with reference to the question of the rejection of the common law rule.

The questions, then, necessary for determination in this case are: First, what is the common law of England as to the rights of riparian proprietors in such a case as this; and, second, are the provisions of the common law applicable, and, if applicable, are they in any way inconsistent with the constitution of the United States, with the organic law of this state or with any law passed by the legislature of this state? These being the questions presented, it is obvious that the weight to be attached to the opinions of the courts of other states upon the question of the rights of riparian proprietors in an abandoned river bed depends upon how far the constitution and statutes of such state correspond with those of this state, as well as upon the persuasiveness of the reasoning set forth in the opinions.

Under the common law of England the title to the bed of the sea below high water mark, and to the bed of all rivers as far as the flow of the tide extended, was in the crown, but the title to the bed of all fresh water rivers above the ebb and flow of the tide, whether navigable or nonnavigable, where the river formed the boundary between adjoining proprietors, was in the riparian owner to the thread of the stream. Lord Hale, De Jure Maris, Hargrave Law Tracts, 5; *King v. Wharton*, 12 Mod. (Eng.) 510; *Hardin v. Jordan*, 140 U. S. 371, 11 Sup. Ct.

Rep. 808; Farnham, Waters, sec. 48; *Shively v. Bowlby,* 152 U. S. 1. Chancellor Kent says: "The right of sovereignty in public rivers above the flow of the tide is the same as in tide waters; they are *juris publici,* except that the proprietors adjoining such rivers own the soil, *ad filum aquæ.* But grants of land, bounded on rivers, or upon margins of the same, or along the same, above tide water, carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river; and the public, in cases where the river is navigable for boats and rafts, have an easement therein, or a right of passage, subject to the *jus publicum* as a public highway. The proprietors of the adjoining banks have a right to use the land and water of the river, as regards the public, in any way not inconsistent with the easement." 3 Kent's Commentaries (13th ed.), p. *427. This also is the rule of the civil law. Ware, Roman Water Law, secs. 22, 94. There appears, then, to be no controversy as to what constitutes the common law of England in regard to fresh waters or navigable rivers above the flow of the tide. Some of the cases in this country fail to draw a distinction between the rule of the common law with reference to rivers which are navigable in fact above the flow of the tide, and those navigable only where the tide flows, and adopted the idea that by the common law no rivers were navigable or considered as navigable in law except those in which the tide rose and fell. Comparing, then, the diminutive size and length and volume of the rivers of England with the magnificent waterways of this country, it was held that the common law as to navigable rivers was inapplicable to the situation in this country, and that our great rivers, which are navigable in fact for hundreds or perhaps thousands of miles, are to be treated in law as were navigable rivers of England, meaning thereby the rivers in which the flow of the tide was perceptible. Much reasoning has been indulged in, based upon the apparent disproportion of the rivers of England

and America, to show the necessity of abrogating the common law rule on account of the actual navigability of our rivers above tide water. However, the rule of the common law has been adopted in Connecticut, Delaware, Georgia, Illinois, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, partly in New York, and in Ohio, South Carolina and Wisconsin. It is rejected in Pennsylvannia, Virginia, North Carolina, Alabama, Florida, Texas, Tennessee, Iowa, Kansas, Minnesota, Missouri, Oregon, Nevada and California. In some of the states which reject the rule the rejection is based upon the system of land surveys of the United States, it being held that, where in the original survey the boundary next the stream is meandered, the government has parted with its title only to the extent of the meander line, and has reserved to itself, or to the state which afterwards was created, the title to the bed of the stream. Later decisions of the United States supreme court, however, have settled that the meander line along the bank of a navigable river is not a monument of title or boundary line, but merely marks the place where the water flowed at the time of the survey (*Hardin v. Jordan,* 140 U. S. 371; *Jefferis v. East Omaha Land Co.,* 134 U. S. 178, 10 Sup. Ct. Rep. 518), and the doctrine of that court now is that, by the admission of the several states, whatever right or title the United States had to the bed of such navigable streams passed to the state government, and that the local law of each state determines the question whether the bed of such streams belongs to the state or to the riparian owner. *Barney v. Keokuk,* 94 U. S. 324; *St. Louis v. Myers,* 113 U. S. 566, 5 Sup. Ct. Rep. 640; *Hardin v. Jordan, supra; St. Anthony Falls Water-Power Co. v. Board of Water Commissioners,* 168 U. S. 349. These decisions of the supreme court of the United States conclusively establish the fact, therefore, that the common law with reference to riparian ownership in navigable streams is not inconsistent with the constitution of the United States nor with the organic law of this state, and, since

no law upon this subject has been passed by the legislature of the territory of Nebraska or of the state of Nebraska, the common law is not inconsistent with the statutory law of the state.

The only remaining question, then, is whether or not the common law rule is applicable to the conditions in this state with reference to the rights of riparian owners upon the Missouri river. As to a portion of such riparian rights this court has already spoken. We have held that the rights of riparian owners upon the Missouri river to land formed by accretion are the same as if the river were not navigable, and that the common law applies in full force. *Gill v. Lydick,* 40 Neb. 508. The same doctrine has been declared by the supreme court of the United States in the case of *Jefferis v. East Omaha Land Co.,* 134 U. S. 178, 10 Sup. Ct. Rep. 518, citing *Jones v. Soulard,* 24 How. (U. S.) 41, and other cases. In passing upon the applicability of the common law to our conditions, in the first place it is well to observe that for upwards of half a century the people of the territory of Nebraska and the state of Nebraska have been in occupancy of the west bank of the Missouri river. The first settlement of the territory was along the Missouri river, and its fertile valley has been the home of thrifty farmers ever since. It is a matter of public knowledge, of which the court will take judicial notice, that that great river in this locality takes its course through a wide valley composed, in the main, of loose, sandy and friable soil of great fertility; that it is subject to annual floods, sometimes of great extent and volume; that its course is erratic and tortuous; that sometimes, during flood periods, its current will strike or impinge upon its banks at such an angle and with such effect as, even in a single day, to undermine the same, and cause large masses of soil to fall into the stream and be disintegrated, and thus whole farms are swallowed up with almost inconceivable rapidity, while in other localities hundreds of acres are often added to its banks by the process of accretion. It is further a matter of common knowledge that at a number of points along the

northern and western boundary of the state the river has, as in this case, cut across the neck of a peninsula, entirely abandoned its old bed, and left the former peninsula, with the abandoned bed, entirely across the river upon the eastern or northern bank, and thus physically dissevered from the state of Nebraska and conjoined to Dakota, Iowa or Missouri.    See *Nebraska v. Iowa,* 143 U. S. 359; *Missouri v. Nebraska,* 196 U. S. 23, 25 Sup. Ct. Rep. 155. These processes have been going on for fifty years.    During the whole period of time the state of Nebraska has existed it has never asserted any title or dominion over the abandoned river bed, but has left the riparian owner in full possession and control of the same to the thread of the stream, and many fertile farms now occupy the place where the waters once flowed.    When the river abandoned the bed the riparian owner occupied it, claiming title thereto, and as fast as it became subject to useful purposes reclaimed it for agriculture.    For so long a period, therefore, it has been considered by the authorities of the state of Nebraska that the common law is applicable to the conditions along the Missouri river, and the fact of this administrative construction of the law by the state authorities, extending over so many years, is entitled to great, if not controlling, weight upon this question.    No evil consequences have been pointed out to us in the brief of defendant in error, which are liable to occur to the public welfare by the continuance of this policy, nor are we able to discern wherein there is any such change in conditions from those which have so long prevailed along this boundary, as would warrant the court in giving a new construction to the rights of riparian proprietors other than that which has been, at leastly tacitly, given by the public authorities for so long a time.    Further, we see nothing in this doctrine which in anywise impairs or interferes with the public right of navigation over these waters. It is true that, while the Missouri river has been declared by congress to be a navigable stream, and while for many years during the early history of the great Northwest its

waters furnished almost the only channel of communication between the settled portions of the United States and the vast territory lying along its course and around its headwaters, still in later years, while intermittent attempts have been made to reestablish the river as a highway of commerce, the difficulties and disadvantages caused by its rapid current, its variable, erratic and inconstant course, and the crumbling nature of the soil upon its banks, have been so great that commerce has abandoned its waters and betaken itself to the more reliable, though perhaps more expensive, method of transportation by rail. Theoretically, therefore, the Missouri river is a navigable stream along the Nebraska boundary. Practically, at the present time, its usefulness as a public waterway has departed. However, in the consideration of this case we have treated it as if it were practically navigable, because, while improbable, it is not impossible that at some time in the future, under changed conditions, these waters may again become a channel of communication and intercourse.

We have seen that the common law rights of riparian owners as to accretions along the bank of this river is in force in this state; and it is a fact within the personal observation of the writer of this opinion that at some points on the boundary of this state, by virtue of the rapid accretions which sometimes take place along this stream, the present channel of the river is removed to a distance of more than a mile from where it was thirty years ago. If no injury is done to the public right by reason of the rapid and numerous changes of the channel of the Missouri river by the action of accretion, by the growth of sand bars and islands, and the gradual filling up of the intervening space between them and the bank, by which changes the bed where the river actually flowed is even more fully and effectually abandoned than where, by a sudden change, the river has left its bed and sought a new one, how can the public be in anywise injured by the latter form of abandonment? The effect is the same in both cases. Along the Missouri river the change of the

bed to dry land in the case of accretion is sometimes even more rapidly performed than the changes of the abandoned bed to dry land in the case of avulsion, for in such case the abandoned bed is usually full of water, which gradually evaporates, and which in many instances forms lakes which stand for years, occasionally filled again by the river in flood periods, a number of these "cut-off lakes," as they are locally termed, extending from three to eight or ten miles long and occupying practically the whole of the abandoned bed for many years.

The fact that the rights of riparian owners are preserved *ad filum aquæ* is not inconsistent with, and does not interfere with, the right of navigation. The public retains its easement of the right of passage along and over the waters of the river as a public highway. This is the interest of the public in connection with such rivers which is paramount, and which is and should be protected by the courts. If, however, the river ceases to be navigable at any particular point, whether by the gradual filling up of its old bed, or a part of it, by the process of accretion, or by a sudden change of its bed by the carving out of a new channel, the public right attaches to the waters of the new channel to the same extent as it did while it flowed in the former bed. The public, then, has lost nothing by the change of channel. All its rights have been retained. As was said long ago by Ulpian: "In like manner if a river leaves its bed and begins to flow elsewhere, whatever is done in the old bed is not subject to the interdict, because not done in a public river, as the bed belongs to the neighbors on each side, or else the bed belongs to the occupant if he has fields marked off thereon. Certainly the bed ceases to be public. Also the new channel which the river has made, although it was private, begins, nevertheless, to be public, because it is impossible that the channel of a public river should not be public." Ware, Roman Water Law, sec. 22. To hold otherwise in case of a stream of the characteristics of the Missouri river might well lead, by way of repeated changes of the

river's channel, to additions to the public domain at the expense of adjoining proprietors. For example, if in this case we should hold that the bed of the abandoned stream belonged to the state of Nebraska, by the same reasoning the bed of the new channel belongs to the state, and if the river should again change its channel near by, by another avulsion, thus leaving the new bed dry, the state then would be the owner of the land in two abandoned river beds and also of the bed of the new channel. The property in the second and third bed then would be wrested without compensation from the property of private individuals. A doctrine which might work such an injustice as this ought never to be adopted by a court if any other view is reasonable. The interest of the public in the waters and bed of a navigable river is analogous to that of the public in a public road. It has the right of passage over the stream as it has over the road. The owner of the land abutting upon a public road can do nothing in any way to interfere with the rights of the public in the same, nor can the riparian owner on the banks of a navigable stream exercise any dominion over its waters or over the bed thereof in any manner inconsistent with or opposed to the public easement. When the public entirely abandons a public road either by virtue of nonuser or by its vacation through proper proceedings, it does not retain the title to the land over which the easement of travel existed, but it reverts to the adjoining owners to the middle of tl ɔ road. And so with a navigable river of this class, when by reason of natural changes the stream abandons the bed over which, through the instrumentality of its waters, the public has the right to pass, the right of passage is as effectually abandoned at that point as when a road is vacated and a new one opened to take its place. The right of the public is to travel in the new road, and its right and privilege to pass over the old one revert to the abutting owners; and so with the river, the public right of navigation attaches to the new channel of the stream by virtue of the change of its waters, over which

alone the right of navigation can exist, and the abandoned bed, which is of no avail for public use as a means of travel, reverts to the riparian owners to the thread of the channel where the waters flowed. For these reasons, we are satisfied that the common law as to the rights of riparian owners to the abandoned channel of a navigable fresh water stream is applicable in Nebraska, and not inconsistent with our laws or constitution, and that therefore the plaintiff is the owner of the property in controversy in this action.

We have not deemed it necessary to cite or particularize more than a few of the large number of cases bearing upon the proposition hereinbefore discussed. They may be found collated and distinguished in Farnham, Waters; Gould, Waters; note to 23 English Ruling Cases, 158; Am. & Eng. Ency. Law (2d ed.), as well as in other standard works of reference. In several instances the courts of a state lying upon the one side of one of our great rivers hold and enforce the rule of the common law, and on the other side of the same river the courts of a sister state declare that the riparian owner only takes to high water or low water mark, as the case may be. On the whole matter, we deem it best to let well enough alone, and adhere to the custom and policy of this state since its earliest settlement. The former opinion in this case is set aside, the judgment of the district court is reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED.