**SIOUX CITY BRIDGE CO. v. MILLER, County Treasurer, et al.***

(Circuit Court of Appeals, Eighth Circuit. March 16, 1926.)

No. 7041.

1. **Schools and school districts ⊙�270—Any identity between boundaries of school district and territorial election precinct held destroyed by subsequent orders.**

Any identity between boundaries of school district and territorial election precinct *held* destroyed by subsequent orders of county superintendent, and not ground for holding that district extended to center of river, as did election precinct.

*Rehearing denied June 10, 1926.

2. **Schools and school districts ⊙�270—Order purporting to extend boundary of district from high-water mark to center of Missouri river held ineffective (Rev. St. Neb. 1913, § 6703 [Comp. St. Neb. 1922, § 6241]).**

Order of county superintendent under Rev. St. Neb. 1913, § 6703 (Comp. St. Neb. 1922, § 6241), purporting to extend school district to include bed of Missouri river between high-water mark and state boundary, center of stream, *held* ineffective.

3. **Schools and school districts ⊙�271—Statute evidencing public policy to include all property in some school district held not self-executing, or effective to automatically extend boundaries of district to include bed of river (Rev. St. Neb. 1913, § 6703).**

Rev. St. Neb. 1913, § 6703, evidencing a public policy to include all property in some school district for school taxation purposes, *held* not self-executing or automatically effective to extend boundary of school district from high-water mark to center of Missouri river.

4. **Schools and school districts ⊙�271—Courts have not power to enforce public policy by attaching territory to school district without affirmative action required by statute (Rev. St. Neb. 1913, § 6703).**

Though Rev. St. Neb. 1913, § 6703, evidences a public policy to include all property in some school district, courts have not power to enforce such policy by attaching territory to school district without necessary affirmative action provided for.

5. **Schools and school districts ⊙�270—Courts cannot assume that territory which might or should have been added to school district was added, where record shows it was not.**

Courts cannot assume that what might or should have been done, namely, addition of bed of river to adjacent school district, was done, where record shows that it was not.

6. **Schools and school districts ⊙�270—Bridge company held not estopped by voluntary payment of taxes for many years to deny that property was within school district.**

Bridge company, by voluntarily paying taxes on part of bridge and approach for many years on what it deemed a reasonable valuation, *held* not estopped, on greatly increased valuation, to assert that property was not within boundaries of district.

7. **Navigable waters ⊙�271(1).**

Whether ownership of bed of navigable streams is in state or riparian owner is determined by law of each state.

8. **Waters and water courses ⊙�271.**

Common-law rights of riparian owners are in force in Nebraska, except as modified or altered by statute.

9. **Boundaries ⊙�271.**

A meander line merely shows water line at time of survey, and does not limit title of grantee thereto.

10. **Navigable waters ⊙�271(2).**

In Nebraska, riparian owner has qualified right to bed of navigable stream consistent with right of public.

**11. Schools and school districts ⬳30—School district, boundary of which was described as "along the river," held to extend to center of river, state boundary.**

School district, boundary of which was described as "along the river," *held* to extend to center of stream, the state boundary, as affected right of district to tax bridge and approach.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Along.]

**12. Schools and school districts ⬳102.**

Absence of direct benefit is not a valid objection to tax of bridge and approach for school purposes.

Appeal from the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Suit by the Sioux City Bridge Company against Walter E. Miller, as County Treasurer of Dakota County, Nebraska, and others. Decree for defendants, and plaintiff appeals. Affirmed.

Wymer Dressler, of Omaha, Neb. (Richard L. Kennedy, of St. Paul, Minn., and Samuel H. Cady, of Chicago, Ill., on the brief), for appellant.

J. J. McCarthy, of South Sioux City, Neb., and W. V. Steuteville, of Sioux City, Iowa, for appellees.

Before KENYON, Circuit Judge, and YOUMANS and FARIS, District Judges.

KENYON, Circuit Judge. Appellant (for convenience hereafter designated as plaintiff) brought this action in the District Court of the United States for the District of Nebraska, Omaha Division, against the county treasurer of Dakota county, Neb., to restrain the collection of certain taxes assessed for the benefit of school district No. 11, in said county, upon a part of plaintiff's bridge and approach thereto across the Missouri river at or near South Sioux City, Neb., contending that the bridge and the east 90 feet of the west approach were not within said school district. School district No. 11 (also known as South Sioux City district, and hereinafter designated as the school district) intervened in said case. The controversy was narrowed to the one question of whether or not the school district included the part of the bridge within the state of Nebraska and the east 90 feet of the west approach. The trial court held against plaintiff and dismissed the bill.

Plaintiff is an Iowa corporation, and pursuant to permission given by act of Congress built a bridge across the Missouri river from near Sioux City, Iowa, on the east, to South Sioux City, Neb., on the west, the western terminus being in section 22, township 29, range 9, Dakota county, Neb. This bridge was completed in 1888, and has been used ever since for railroad purposes. At the time of its completion the high bank of the river was about 90 feet west of pier No. 5, the west pier of the bridge. At the time of the trial the high bank of the river was east of this, and there had been considerable accretion along the river bank. Dakota county extends to the state line. State and county taxes have been paid by plaintiff on the bridge and approach valuations to the state line, which is the center of the main channel of the Missouri river.

The school district has for years asserted the right to tax this property for school purposes, and there has been litigation with reference thereto both in the state and federal courts. One action was brought in the United States District Court at Omaha to restrain the school district from collecting taxes levied upon the west one-half of plaintiff's bridge. The limits of the school district were not determined by the decree in said case filed in 1903.

In an action in the state court of Nebraska by plaintiff against the county of Dakota to correct alleged errors in the proceedings of the board of county commissioners in assessing taxes upon said bridge and its approach, a decree was entered on June 13, 1904, by consent, which had in it this provision: "That so long as the bridge property of the Sioux City Bridge Company in Dakota county, consisting of the bridge structure proper and the west approach thereto, shall continue to be assessed for the purposes of taxation in said county at the total sum of sixty thousand ($60,000) dollars, and no more, the said Sioux City Bridge Company will make no objections to the levy of taxes upon said bridge property for and on behalf of school district No. 11 of Dakota county: Provided that, however, if at any time the valuation of said bridge property for the purposes of taxation in said Dakota county shall be raised above sixty thousand ($60,000) dollars, said Sioux City Bridge Company shall not, by any acquiescence theretofore in the taxation of said property, for and on behalf of said school district, or the payment of taxes thereon, or by reason of any matter or thing in this judgment contained, be concluded or estopped from, or prejudiced in, claiming that any part or all of its said bridge property, commencing ninety (90) feet west of the fifth or westerly pier of said bridge and extending across said river to the first or easterly pier thereof, is not

within the limits of said school district No. 11, and therefore not bound to respond in taxes for the benefit of said school district."

After the entry of this decree in the state case the valuation was increased from time to time. The $60,000 assessment provided for by the decree was increased by 1920 to $700,000, and the school tax increased from $780 in 1904 to $8,750 in 1921. Plaintiff paid the school district taxes upon this property in the year 1904 and until 1921. For the year 1920 they were paid under protest. For 1921 it offered to pay on the west approach, except the east 90 feet.

Another case was also brought by plaintiff against Dakota county in the state court of Nebraska, in which decree was filed February 14, 1924, providing in part as follows: "For the years 1918, 1919, and 1920, the valuation of said property shall be fixed at five hundred sixty thousand and no/100 dollars ($560,000), of which amount two hundred thousand and no/100 dollars ($200,000) shall be fixed as the valuation of the approach to said bridge (except the east 90 feet in Dakota county), and three hundred sixty thousand and no/100 dollars ($360,000) shall be fixed as the valuation of the bridge proper, including the east 90 feet of the approach. For the years 1921 and 1923 the valuation of said property shall be fixed at five hundred thousand and no/100 dollars ($500,000), of which amount two hundred thousand and no/100 dollars ($200,000) shall be fixed as the valuation of the approach of said bridge (except the east 90 feet) in Dakota county and three hundred thousand and no/100 dollars ($300,000) shall be fixed as the valuation of the bridge proper, including the east 90 feet of the approach."

The school district issued $22,000 of bonds in 1915 and $30,000 of bonds in 1920. It is the theory of plaintiff that the part of the bridge in the state of Nebraska and the east 90 feet of the west approach are not in school district No. 11, nor in any other school district; that the government never surveyed the bed of the Missouri river; that fractional section 22 ended at high-water mark, as shown by the government survey of 1870; and that the school district ended where this survey showed fractional section 22 ended.

A variety of claims is made by the school district to sustain the position that the property sought to be taxed is within the school district. Some of them we group as follows:

(a) That the school district embraced this territory because of the creation while Nebraska was a territory of the Covington election precinct, which it is asserted extended to the center of the river, and that the election precinct and school district were identical under territorial laws.

(b) That the order of the county superintendent in 1904, upon petition of voters within school districts numbered 11, 23, and 27, established the boundary of the school district.

(c) That this provision of the Nebraska law, "Provided, on January 2, 1910, any territory which is not then a part of any school district shall, by the county superintendent of the county in which such territory lies, either be organized into new districts or attached to one or more adjoining districts: Provided further, changes affecting cities shall be made upon the petition of the board of education of the district or districts affected" (found in Rev. Stat. Neb. 1913, § 6703), automatically annexed that portion of the river bed adjacent to fractional section 22 extending from high-water mark to the center of the stream and covering the property in question.

(d) That the plaintiff, by paying school taxes levied against the bridge and the approach for many years, was estopped to claim said taxes were void in the year 1921.

Others are urged, but we desire to consider and dispose of these first and in their order.

[1] It will be observed from the history of this school district, as appears in the agreed statement of facts in the case of Sioux City Bridge Company v. County of Dakota et al. in the court of the United States for the district of Nebraska (made a part of the record in this case) that it runs back to the old Covington election precinct as organized in 1863, and was in existence prior to 1872, exercising the rights and franchises of public corporations of the class known as school districts. The records of the county commissioners of Dakota county for the year 1858 and a part of 1859 are shown by the evidence to contain this provision: "That an election precinct be established, and that the boundaries thereof be as follows, to be designated and known as Covington election precinct, to wit: Commencing in the center of the Missouri river where township No. 29 north, range No. 9 east, intersects said river, and running thence east to said river."

In those early days the Missouri river executed an ox bow loop, and the precinct was included in the loop, bounded on one side by a line extending from the center of the Missouri river on the west to the river on the east. The school district claims in its brief

that under territorial laws of 1857 and 1858 this precinct became a school district and embraced the land where the property in dispute now is. From that time forth various changes were made in the boundaries of the school district, especially after the Missouri river broke through and changed its course, ending the loop and destroying the west boundary of the district theretofore existing. That there was a school district in territorial days approximately coextensive with the Covington election precinct is apparent. Its exact boundary is involved in doubt and uncertainty. Evidently no reliance was placed by the school district or the inhabitants thereof in subsequent years on this theory of a precinct and school district identity, as is indicated by the repeated changes in the boundaries thereafter made by the county superintendent after statehood. If identity ever existed between the school district and the Covington election precinct it was certainly destroyed by the subsequent orders.

[2] The chief reliance of the school district is the order of the county superintendent, George J. Boucher, of July 30, 1904, as follows:

"Dakota City, Nebraska, July 30, 1904.

"In the Matter of the Correction of Boundaries of School District No. 11, Dakota County, Nebraska.

"Now, at this time, July 30, 1904, petitions were filed from school districts Nos. 11, 23, and 30, praying for a correction of boundary of school district No. 11 so that district No. 11, when so corrected, shall be bounded as follows: Commencing at the southwest corner of lot No. 2 in section twenty-nine (29), township 29, range 9, in Dakota county, Nebraska, on original state boundary line, Nebraska and Dakota, running thence east one mile to the center of section 28 of said township, then south 31½ rods; thence east 80 rods; thence north 31½ rods; thence east 80 rods; thence north on section line between sections 27 and 28 to the northeast corner of said section 28; thence east on section line between sections 22 and 27 in township 29, range 9, to the state boundary line between the states of Nebraska and Iowa at the center of the channel of the Missouri river; thence up said Missouri river along the said boundary line to the point where the old original Nebraska and Dakota state boundary line intersects the said state line of Nebraska and Iowa; thence, following said original state boundary line between the states of Nebraska and Dakota, to the place of beginning. I have examined the petitions submitted, and find that they contain more than two-thirds of the number of legal voters in the respective districts. I also find that notices were duly posted according to law, and that all the requirements of law have been complied with. It is therefore ordered by me that the prayer of the petitioners be and hereby is granted, and the boundaries of school district No. 11 are hereby corrected to read as prayed in the petition filed this 30th day of July, 1904, and as written above."

This order attempted to correct the records and fix definitely the center of the channel of the Missouri river as the boundary line of the district on the east and north along fractional section 22. Under the Nebraska law the county superintendent has large powers in the formation of school districts and the adding thereto or subtracting therefrom of territory. Section 6703, Rev. Stat. Neb. 1913; section 6241, Comp. Stat. Neb. 1922.

The proceedings resulting in the order of July 30, 1904, which purported to fix the boundaries of the school district on the east and north at the center of the channel of the Missouri river were taken under chapter 59, Laws of Nebraska of 1901 (section 6703, Rev. Stat. Neb. 1913). The petition presented to the county superintendent was signed by 169 residents of district No. 11, 36 of district No. 30, and 12 of district No. 23. The purpose of the petition was to correct the records of district boundaries, and petitioners, in describing the territory of school district No. 11, named fractional section 22 as part thereof. There are some technical objections raised that the notices of hearing on the petition were not sufficient, which we deem unnecessary to determine.

The first division of said section 6703 provides that the county superintendent has discretionary power to create a new district from other organized districts, upon a petition signed by one-third of the legal voters in each district affected. Clearly the petition under which the order of July, 1904, was made is not for a new district formed out of other organized districts. Hence the first division of the section does not apply.

The second division, evidently the one under which the county superintendent acted, gives discretionary power to him to change the boundaries of any district upon petition signed by one-half of the legal voters of each district affected; also to annex to any existing district any territory not organized into districts upon petition signed by one-half of the legal voters in the district and in the ter-

ritory proposed to be annexed. The petition presented, whether it be considered one to annex new territory, or, as it states, to correct the record of the boundaries of school district No. 11, was not signed by any voters within the territory sought to be annexed, for the very good reason that there were no voters living on the Missouri river. This appears in the agreed statement of facts:

"It is further stipulated and agreed that in the territory or space from the west and south bank of the Missouri river to the center of the channel of said river or to the state line between Nebraska and Iowa, which space and plaintiff's bridge property therein have been taxed on account of school district No. 11, which taxes are the subject of this suit, has never heretofore contained, and does not now contain, any residents, legal voters, or school children, nor any inhabitants, but said space has always been, and is now, a part of the bed and flowing stream of the Missouri river."

The second division of said section 6703 is not applicable to the situation here presented.

The third division of the act differs from the second, in that the county superintendent is required to change the boundaries of a district, or to organize a new district, when he is requested by a petition signed by two-thirds of the legal voters in said district, or the territory proposed to be attached, so to do. This is no more applicable than the second, and for the same reason.

The Nebraska courts have held that while a superintendent of public instruction acts judicially in the forming of a new district, his orders and findings need not have the formality of the judgment of a court of law, but that the record must show a substantial compliance with the statutes. Biart et al. v. Myers et al., 3 Neb. (Unof.) 196; 91 N. W. 573; Proudfit v. School District No. 49 et al., 109 Neb. 173, 190 N. W. 874. This record fails to show the necessary judicial requirements for the making of the order. It was without authority and made no change in the boundaries of the school district. If the Missouri river and its bed, where the bridge and approach in controversy are located, were not in the school district prior to this order, they were not brought into it thereby.

[3] Another contention of the school district is that under the provision of section 6703, Rev. Stat. Neb. 1913, reading as follows: "Provided, on January 2, 1910, any territory which is not then a part of any school district shall, by the county superintendent of the county in which such territory lies, either be organized into new districts or attached to one or more adjoining districts: Provided further, changes affecting cities shall be made upon the petition of the board of education of the district or districts affected" the land along, and the bed of the Missouri river adjacent to, fractional section 22 and west of the state line were automatically at said date attached to the school district. It is quite apparent that the section relied on required affirmative action by the county superintendent. It is not self-executing, and from the record it appears that no action thereunder was taken by the county superintendent. This section also provides that changes affecting cities shall be made upon petition by the board of education for the district or districts affected. No such action was taken. However it is fairly inferable from the record that South Sioux City was not a city at that time, so that part of the statute is inapplicable.

[4, 5] It is undoubtedly true, as urged, that this provision of the statute evidences the policy of the state of Nebraska to include all property in some school district for school taxation purposes, but a court is not given power to enforce such public policy by attaching territory to school districts. Nor can it assume, as argued, that what might or should have been done by the county superintendent in an attempt to attach lands to a school district has been done, when the record shows it has not. Therefore this provision of the statute in our judgment does not change the boundary of the school district, and, if the bridge and the part of the approach in controversy were not included in district No. 11 prior to the passage of this act, they were not made part thereof by said act.

[6] It appears from the record that plaintiff paid school taxes levied on the valuation of that part of the bridge and approach now in question from 1904 to 1921, and it is suggested that therefore, especially in view of bonds having been issued, it is estopped to now assail the validity of the taxes of 1921. In Chicago, B. & Q. R. Co. v. Cass County, 51 Neb. 369, 70 N. W. 955, it was held that, where the officers of a railroad company had listed with the officers of the school district for taxation a bridge, erroneously believing that it was within the limits of such school district, in an action subsequently brought to enjoin taxes on the ground that it was not within such limits the railroad company was

not estopped from maintaining the action because of listing its property for taxes.

The facts here are somewhat different from those in the Cass County Case, for here the plaintiff knew after 1904 that the school district claimed the property to be within its boundaries, and it was apparently willing to voluntarily pay taxes upon what it considered reasonable valuations rather than litigate the question. There seems to have been no procedure under the Nebraska law by which it could have appealed from the county superintendent's order of July 30, 1904. Of course, it could have brought action to question the validity of such order. If plaintiff's action in paying taxes could be construed as an acquiescence in the boundary lines attempted to be established by the order of 1904, and such acquiescence resulted in prejudice to the district or parties entitled to complain, there might be substantial ground to urge an estoppel. It is not asserted that the bondholders are in any way prejudiced if the property in dispute is not included in the school district. No claim is made that there is not ample property within the district upon which taxes may be assessed to pay the bonds. Certainly, if the school taxes which have been paid by the plaintiff on this property were illegally levied, the school district is not prejudiced by the taxpayer refusing longer to pay them. In any event, under the conclusion we have reached in this case, the doctrine of estoppel is unimportant. The facts urged to constitute estoppel are, however, enlightening as bearing on plaintiff's acquiescence in certain boundary lines hereafter referred to.

None of the foregoing propositions urged by the school district is sufficient in our judgment to sustain its claim. We have carefully examined and re-examined the somewhat jumbled records of the county superintendents as to orders other than that of July 30, 1904, to ascertain if any of them furnish a basis for including the bed of the Missouri river in the school district. Many orders have been made in the years that this matter has been in dispute, and from the multiplicity thereof we refer to the following:

The first description after statehood of school district No. 11 appears under date of December 24, 1872, and is as follows:

"School District No. 11. Revised December 24, 1872. School district No. 11 shall be included within the following described limits, to wit: 'Commencing where the south line of section 21, township 29, range 9, intersects the Missouri; thence east on the said section line until it again intersects Missouri river;

then following the river back to the place of beginning—all in township 29, range 9.'
"[Signed]    J. C. Spencer,

           County Superintendent."

Again, same date:

"District No. 11. Date of formation, December 24, 1872. Description: Commencing 80 rods north of the place where the south line of section 21, township 29, range 9, intersects the Missouri river; thence north along the river to within 80 rods of the intersection of the south line with the river; thence east to place of beginning."

At page 11 of said record appears the following:

"District No. 11. Date of formation, December 31, 1886. Description: I have this day attached to district No. 11 unorganized territory, which will change the boundaries of said district and cause it to read as follows: 'Commencing at a point in section 20, township 29, range 9, where the state boundary intersects a line 80 rods from and parallel with southern boundary of section 20, township 29, range 9; thence from point of intersection east of Missouri river; thence north and west along the river to the terminal point of state boundary; thence south is state boundary the western boundary of district to place of beginning.'
"[Signed] Will C. Dibble,

         "County Superintendent."

From page 15 of said record appears the following:

"District No. 11. Date of formation, November 29, 1887. Description: By reason of the formation of district No. 37, the boundaries of No. 11 will read as follows: 'Commencing at a point in section 20, township 29, range 9, where the Missouri river intersects a line parrallel with and 80 rods from the northern boundary of section 20, township 29, range 9; thence east to the N. E. Cor. of the S. E. ¼ of N. E. ¼ of section 21, town 29, range 9; thence south ½ miles; thence due west to the river; thence north and west along the river to the place of beginning.'
"[Signed] Will C. Dibble,

         "County Superintendent."

From the order of July 31, 1893, the following:

"Thence due east to bank of Missouri river, and thence following the bank of the Missouri river in its meandering course northwesterly, westerly, and southwesterly to the point of beginning, and including all the territory heretofore belonging to districts 11 and

37 in Dakota county, Nebraska, as being prior to this 31st day of July, 1893, and that the same contains not less than four sections of land and is less than six miles in any one way or direction, and I further find that the school officers from school district No. eleven (11) shall continue the officers of the district now formed.

"Dated July 31, 1893.
"[Signed] W. F. Bartlett,
"County Superintendent."

In addition to these orders there are innumerable others adding to and taking territory from the school district, consolidating parts of other districts therewith, and with misdescriptions, inaccuracies, and errors an attempt to trace the true boundaries of school district No. 11 furnishes as much mental exercise as the most intricate cross-word puzzle. The labyrinthical intricacies of this situation appear from a perusal of these various orders. The earliest record refers to Covington election precinct, and speaks of "commencing in the center of the Missouri river" at a certain point; thence running east to said river and "following the center of said river to the place of beginning." The order of December 24, 1872, refers to the boundary line as intersecting the Missouri river. On the same date 80 rods was added to the district, and again the language "intersects the Missouri river" is used, and also the language "along the river." The order of December 31, 1886, referring to the attachment to district No. 11 of unorganized territory which will change the boundaries, states the boundaries of the district will commence at a point "where the state boundary intersects" a certain line; "thence from point of intersection east of Missouri river; * * * thence north and west along the river to the terminal point of state boundary." The order of November 29, 1887, refers to the boundaries of school district No. 11 on the east, "north and west along the river to the place of beginning." The order of July 31, 1893, refers to-the east boundary of school district No. 11 as "following the bank of the Missouri river in its meandering course northwesterly, westerly, and southwesterly."

Plaintiff seems to have accepted in its brief the description in the county superintendent's records as to the November 29, 1887, formation of the district, saying: "Under date of July 31, 1893, the county superintendent's record shows (Rec. p. 43), by reason of the formation of district No. 37, the boundaries of No. 11 will read as follows: Commencing at a point in section 20, township 29, range 9, where the Missouri river intersects a line parallel with and 80 rods from the northern boundary of section 20, township 29, range 9; thence east to the northeast corner of the S. E. ¼ of N. E. ¼ of section 21, township 29, range 9; thence south one-half mile; thence due west to the river; thence north and west along the river to the place of beginning. From time to time districts Nos. 37, 23, and 11 were consolidated and subdivided. (Rec. pp. 43 and 44.)"

To illustrate the difficulties presented to the court in this case, the description of the school district in the order of November 29, 1887, in the agreed statement of facts on pages 42 and 43 of the record, is as above stated by plaintiff, while in the statement of facts used in the proceedings in the case in the United States court for the district of Nebraska, in which decree was filed in 1903, the description of district No. 11 is as follows: "Commencing at a point in 20, 29, 9, where the Missouri river intersects a line parallel with and 80 rods from the northern boundary of 20, 29, 9; thence east to the N. E. cor. of the S. E. ¼ of N. E. ¼ of 21, 29, 9; thence south ½ mile; thence due east to the river; thence north and west along the river to the place of beginning."

This description uses the words "due east," instead of the words "due west," as appear in the other order. Otherwise the descriptions are identical. If the order as set forth in the agreed statement of facts in this case is correct, then the description is as utterly unintelligible, when the attempt is made to trace it on the maps and surveys in the record, as are many of the other descriptions. Under that description the school district would not embrace fractional section 22, nor touch the Missouri river to the east thereof. We are satisfied the word "west," in the phrase "due west," is an error, and that the phrase "due east," as used in the statement of facts in the other case (made part of this record), is correct. Under this description the school district ran "due east" to the river, and thence "north and west along the river."

We are fortified in this view by the description in the order of December 31, 1886, using much the same language. In the confused condition of this record, and in view of plaintiff adopting in its brief the description of November 29, 1887, we are warranted in accepting the correct version of the same as the boundary of the school district on the east and north. Does this boundary limit the school district to the meander line of frac-

tional section 22, or is it a description of a district extending to the center of the river? Reliance is placed by plaintiff on the case of Chicago, B. & Q. R. R. v. Cass County, 51 Neb. 369, 70 N. W. 955. It is there held that, where the school district includes a fractional section abutting on the meander lines of the Missouri river between Nebraska and Iowa, the high-water mark is the boundary of the fractional section, and the boundaries of the school district end with the high-water mark, and that the bridge involved in that case could not be taxed for school purposes. Were there no other decision of the Supreme Court of Nebraska bearing on the question, this case would be conclusive of the matter here in controversy.

In Kinkead v. Turgeon et al., 74 Neb. 573, 580, 104 N. W. 1061, 109 N. W. 744, 1 L. R. A. (N. S.) 762, 7 L. R. A. (N. S.) 316, 121 Am. St. Rep. 740, 13 Ann. Cas. 43, where the question involved arose from a sudden abandonment of a part of the channel of the Missouri river, the Supreme Court announced certain propositions which it seems to us undermine the authority of the Cass County Case. While that case was not mentioned, criticized, or distinguished in the Kinkead v. Turgeon opinion, supra, and the question was the extent of the ownership of a riparian owner of the bed of a river in case of a sudden change of the channel, and while the Cass County Case dealt with the boundaries of a school district in its relation to a fractional section abutting on a navigable river, yet the views expressed in Kinkead v. Turgeon cannot be harmonized with those announced in the Cass County Case. The holding of Kinkead v. Turgeon appears to be that the rights and ownership of riparian proprietors in Nebraska along the Missouri river extend to the center of the stream, unless the terms of the grant indicate an intention to limit grantee to the bank or margin thereof; the public retaining "its easement of the right of passage along and over the waters of the river as a public highway."

[7] The law of each state determines whether the ownership of the bed of navigable streams is in the state or the riparian owner. Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224; Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 168 U. S. 349, 18 S. Ct. 157, 42 L. Ed. 497.

[8] The common-law rules as to rights of riparian owners are in force in Nebraska, except as modified or altered by statute. Crawford Co. v. Hathaway et al., 67 Neb. 325, 93 N. W. 781, 60 L. R. A. 889, 108 Am. St. Rep. 647; Meng v. Coffee, 67 Neb. 500, 93 N. W. 713, 60 L. R. A. 910, 108 Am. St. Rep. 697; Kinkead v. Turgeon et al., 74 Neb. 573, 104 N. W. 1061, 109 N. W. 744, 1 L. R. A. (N. S.) 762, 7 L. R. A. (N. S.) 316, 121 Am. St. Rep. 740, 13 Ann. Cas. 43; Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636.

[9] The meander line is merely to show the water line at time of survey and does not limit title of grantee thereto. Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872; Albany R. Bridge Co. v. People ex rel. Matthews, County Collector, 197 Ill. 199, 64 N. E. 350.

[10, 11] It seems clear to us, under the principles of the Turgeon Case, that in Nebraska the riparian owner along the Missouri river has a qualified right to the bed of the stream consistent with the rights of the public. The riparian landowners along fractional section 22, owning under the Nebraska decisions the bed of the river to the center of the channel subject to the public easement, the right of such public or quasi municipal corporation as a school district is governed by the same rule, and the description of the order of December 31, 1886, "north and west along the river," and of November 29, 1887, "along the river," described the school district as extending to the center of the Missouri river along fractional section 22, and therefore the property in question was in the school district and subject to taxation for school purposes in 1921. The expression "along the river" does not show any intention that the district be limited to the river bank and not reach to the center of the stream. Western Maryland Tidewater R. Co. v. Mayor, etc., of City of Baltimore, 106 Md. 561, 68 A. 6; Gouverneur et al. v. National Ice Co., 134 N. Y. 355, 18 L. R. A. 695, 30 Am. St. Rep. 669, 31 N. E. 865; Varick v. Smith and the Attorney General, 9 Paige (N. Y.) 547; State ex rel. Columbia Bridge Co. v. City of Columbia, 27 S. C. 137, 3 S. E. 55; Jones v. Soulard, 24 How. (65 U. S.) 41, 16 L. Ed. 604; Fulton Light, Heat & Power Co. et al. v. State of New York, 200 N. Y. 400, 94 N. E. 199, 37 L. R. A. (N. S.) 307; Walton v. Tifft, 14 Barb. (N. Y.) 216; 9 Corpus Juris, § 7, p. 154; Luce v. Carley, 24 Wend. (N. Y.) 451, 35 Am. Dec. 637; Hanlon v. Hobson (Colo.) 42 L. R. A. 502.

In Jones v. Soulard, supra, the descrip-

tion was identical with that set forth by plaintiff in its brief as the description of the school district as its eastern boundary.

It appears from this record that plaintiff paid taxes on the land accreted to fractional section 22, being the land between the high bank and the water in the river. It apparently did not insist that fractional section 22 ended at the high-water mark. On this question the trial court in its opinion said: "But I am somewhat impressed by the further argument that has been made that probably the process of accretion that has been going on there of itself may change the boundary of the district. That may be a significant fact in the case. It appears undisputed that the railroad company does go ahead and pay school district taxes upon its accretion land, utterly inconsistent with its position that the school district ends at the high bank. It seems to be willing to pay the tax, and to recognize the authority of the school district to tax the accretion land far to the east of the high bank, which was the meander land apparently, and possibly within some of the descriptions of the boundary of the school district."

[12] Plaintiff complains that the only purpose of the school district in insisting that its boundaries cover the property in question is to impose taxes on the bridge and approach, and says, after referring to the police power of the state: "But the school district has no police power. It has no police protection against fire, damage, theft, or any hazard which the bridge might be subjected to. The only purpose of the school district in wanting to extend its boundaries is for the collection of additional revenue from the plaintiff without any possibility of a corresponding benefit resulting to the plaintiff. * * * The school district makes no pretense of maintaining police or fire protection or any other protection. Its one function is to levy and collect taxes for the maintenance of the schools." This, while rather a novel argument against the levying of school taxes, is not an impressive one. It is the undoubted public policy of Nebraska that all property within the state be subject to taxation for school purposes, and that taxation is not confined to those who have children who may attend the schools or who live on the property. That the bridge and approach should not be taxed for school purposes, because there may be no direct benefit resulting to plaintiff, is not a valid or sound objection to the tax. If the property is in fact in the district, it is plaintiff's duty to pay such fair taxes as may

12 F.(2d)—4

be assessed on its property for school purposes. Farnham on Waters and Water Rights, vol. 2, §§ 325, 325b, and cases there cited.

In view of the uncertainties in the description of the boundaries of this school district, the fact that for 16 years plaintiff recognized the east line extending beyond the meander line of fractional section 22 by paying taxes on its property there situated, that the description of the district in nearly all the orders of the county superintendents reach over into the river in fixing the boundaries thereof, that plaintiff now relies in its brief on a description defining the east boundary line as "along the river," and that other orders of the county superintendent use the same term, "along the river," as the eastern boundary, and further in view of the Nebraska doctrine that the riparian owner has title in the river bed to the center of the Missouri river, we are satisfied the decision of the trial court is correct, and that the school district extends to the center of the main channel of the Missouri river adjacent to fractional section 22.

We are not in agreement with all the reasons set forth by the trial court in its opinion, but are satisfied with its conclusion. The increase in the assessed valuation of this property from $140,000 in 1920 to $700,000 in 1921 is rather shocking to a court of equity, but we assume there is a proper procedure to determine the fairness of such valuation. Indeed, the amount seems to have been reduced to $500,000 for the year 1921 by decree of the district court of Dakota county. In any event that question is not before us.

The decree is affirmed.